IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72093-7-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED IN PART OPINION |
| | ) | |
| LOVETT JAMES CHAMBERS, | ) | |
| | ) | |
| Appellant. | ) | FILED: December 19, 2016 |

SCHINDLER, J. — The State charged Lovett James Chambers with murder in the second degree of Michael Travis Hood. Following a seven-week trial, the jury convicted Chambers of the lesser included offense of manslaughter in the first degree. Chambers contends the evidence does not support the decision to instruct the jury on the lesser included offense of manslaughter in the first degree and the court erred in denying his motion to suppress evidence seized from his home and statements he made after his arrest. Chambers also claims he is entitled to reversal because he was denied his right to counsel during the videotaped deposition of a witness and prosecutorial misconduct during closing argument denied him of the right to a fair trial. Viewed in the light most favorable to the State, the evidence supports the decision to give the lesser included manslaughter instruction. We conclude the court erred in denying the motion to suppress evidence seized from the house. The warrantless entry and protective sweep

was not justified under <u>Maryland v. Buie</u>, 494 U.S. 325, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990), but the error was harmless beyond a reasonable doubt. Because the unchallenged findings support the conclusion that the police "scrupulously honored" the right to remain silent under <u>Michigan v. Mosley</u>, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975), and the record shows Chambers was not deprived of his right to counsel or a fair trial, we affirm.

## FACTS

Between 1966 and 1989, Lovett James "Cid" Chambers was convicted of several serious felonies and incarcerated in the California State prison system and the federal prison system. After his release from custody in 1989, Chambers moved to Seattle and worked in the construction industry. Chambers later obtained degrees in computer science and started an IT[1] business.

Chambers and Sara started dating in 1991 and were married in 1992.[2] Chambers never told Sara about his felony convictions or the time he spent in prison. In 1993, Chambers and Sara purchased a house in West Seattle.

A few years later, Chambers asked Sara to buy him a Colt .45 caliber semiautomatic handgun. Sara purchased the gun for his birthday. The Colt .45 is registered to Sara. Chambers routinely carried the gun with him and would often go to the shooting range.

The Feedback Lounge is a bar located approximately a mile from Chambers' house in West Seattle. Chambers went to the Feedback Lounge at least four to five

---

[1] Information technology.

[2] We refer to Sara Chambers by her first name for purposes of clarity.

times a week. Chambers would arrive between 4:00 and 4:30 p.m., sit at one end of the bar, and drink a couple of vodka martinis.

After a "significant snow storm", it was cold, wet, and windy on Saturday, January 21, 2012. That afternoon, Chambers stopped at the Rocksport Bar & Grill to have a beer with friends. After approximately 45 minutes, Chambers left and drove to the Feedback Lounge. Chambers parked his blue 1998 BMW M3 facing south on California Avenue SW in front of the Beveridge Place Pub. The Feedback Lounge is located 72 feet south of the Beveridge Place Pub on California Avenue SW.

Chambers arrived at the Feedback Lounge at approximately 4:30 p.m. When the bartender arrived for her 5:00 p.m. shift, Chambers was "sitting in one of his favorite seats . . . at the very end of the bar" drinking a vodka martini. Chambers' friend Pierre Rodrick arrived at the Feedback Lounge around 8:00 p.m. Over the course of the next hour and a half, Chambers had two or three more vodka martinis and a shot of vodka. Rodrick left around 9:30 p.m. Chambers went to the restroom before leaving the bar to drive home.

Forty-two-year-old Jonathan Vause and 35-year-old Michael Travis Hood were also at the Feedback Lounge that night. Vause and Hood are Caucasian males of average height and weight. Vause and Hood had been good friends since 1996. Vause grew up in North Carolina and lived in Tennessee and Florida. Vause moved to Seattle in 2010, worked as a general manager of a café, and lived in West Seattle. In 2011, Hood moved to Seattle and Vause helped him find a job.

Vause and Hood got together after work on Saturday, January 21. Between 5:00 and 8:30 p.m., they smoked marijuana and had a beer or two. At 8:30 p.m., they drove

to the Rocksport Bar & Grill. The bar was "packed" with "nowhere to sit." Vause and Hood left and drove to the Feedback Lounge. Vause parked his red 1996 Ford Ranger pickup truck between a backhoe and a large van on California Avenue SW in front of Morgan Junction Park. The Ranger pointed south and the passenger door opened onto the sidewalk. Morgan Junction Park is a small park located 195 feet north of the Feedback Lounge.

Vause and Hood arrived at the Feedback Lounge at approximately 9:00 p.m. Because the bar was crowded, they went to the back area. They had a couple beers, ordered some food, played PAC-MAN, and left 40 to 45 minutes later. As they were leaving, Vause noticed Chambers standing to the right of the front door. Chambers is a 67-year-old six-foot-three-inch-tall African American who weighed approximately 225 pounds. Vause thought Chambers worked as security for the bar.

After leaving the Feedback Lounge, Vause and Hood walked north on California Avenue SW toward the Ford Ranger. When they reached the alleyway between the Feedback Lounge and the Beverage Place Pub, Hood turned and walked down the alleyway.

> I looked at Travis and told him the truck was that way. When he responded, kind of went across at an angle where he stopped and back down to the corner and back down the sidewalk, he went at an angle towards me and proceeded towards the truck as well.

Because it was cold and windy, Vause did not wait for Hood and walked "really fast" to his truck. Vause unlocked the doors, got in the driver's seat of the truck, and waited for Hood. A full-size van parked in front of the truck blocked his view. Vause could see down the sidewalk "just about to the front door" of the Beveridge Place Pub but he did not "have a clear view all the way down the sidewalk to the Feedback." A few

4

seconds later, Vause saw Hood walking up the sidewalk and Chambers walking six to eight feet behind Hood.

When Hood reached the pickup truck, he opened the passenger-side door and then grabbed a flat-head shovel out of the back. Hood "pulled" the shovel "up in a batter's stance" and held it "like a baseball bat." Chambers "jumped back about three steps" until he was 9 or 10 feet away from Hood. Hood yelled at Vause, "[W]atch out, he's got a gun," and immediately "spun and turned to try to get into the truck."

Vause heard a shot fired and saw the flash as he got out of the truck and "crouched down hiding behind the bed of my truck." Chambers fired two more shots. After the gunfire stopped, Vause watched Chambers put the gun "back inside of his jacket" and "just casually walk[ ] away" back toward the Feedback Lounge.

Hood was lying facedown across the seat of the pickup truck. Vause pulled Hood's legs into the pickup, pushed the shovel handle out the door onto the sidewalk, and drove away "as quick as possible" to get medical help. Meanwhile, Chambers walked to his BMW parked in front of the Beveridge Place Pub and drove home.

A number of witnesses called 911. Witnesses told Seattle Police Officer Brian Koshak the suspect "was a black male wearing blue jeans, a shiny leather jacket, and a black beanie." An employee of the Feedback Lounge said "somebody that matched that description [was] in the bar" that night who "went by Cid" and drove a blue BMW M3. The employee provided Officer Koshak with a credit card receipt signed by "Lovett Chambers." Officer Koshak found three shell casings from a .45 caliber handgun, a shovel, and blood on the sidewalk near Morgan Junction Park.

When paramedics responded to a nearby location, Hood was in critical condition. While medics transported Hood to Harborview Medical Center, Officer Brandon McDougald took a statement from Vause. Vause was "very coherent," did not smell of alcohol, and "seemed rather in shock." Hood died at Harborview from lethal gunshot wounds to his back.

Seattle police arrested Chambers at his home at 10:49 p.m. Officer Anthony Belgarde read Chambers his Miranda[3] rights at 10:51 p.m. Chambers smelled of alcohol. He was "swaying," had trouble balancing, slurred his words, and was argumentative. Officer Kyle Galbraith drove Chambers to the precinct. Officers obtained a warrant to search Chambers' home and seized a loaded .45 caliber handgun, a spare magazine, and the BMW keys. The police impounded the BMW.

After obtaining a blood draw from Chambers at Harborview, Detective Cloyd Steiger and Detective E. Jason Kasner advised Chambers of his Miranda rights. Chambers agreed to talk to the detectives. The recorded interview began at approximately 4:00 a.m. and lasted approximately an hour. Before the interview begins and while Chambers is alone, he shakes his head and says, "Goddamn. Fuck. Um! Goddamn! What the fuck. Goddamn! . . . Ah, Fuck. What the fuck happened?" When the detectives enter the room and begin the interview, Chambers says, "Tell me what happened, man."

Chambers told the detectives he was at the Feedback Lounge drinking martinis from approximately 4:30 p.m. until he left at approximately 9:30 p.m. to go home. Chambers said he keeps a Colt .45 underneath the passenger seat of his BMW. He said he remembered parking the BMW in front of the Beveridge Place Pub that night

---

[3] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

and getting into his car to go home. But Chambers did not remember "any trouble" when he got in his car and did not know what happened. Chambers told the detectives:

> You know, the only thing I can think of, you know, like is that these guys must have or, or, whoever, whoever was involved, they must've, they had to have made a, a, a move of aggression on me.

Chambers did not remember having the Colt .45 in his hand that night or setting it on the kitchen table when he got home. Chambers denied ever experiencing a blackout from drinking.

Detective Steiger told Chambers there was "no question you shot [Hood]. The only question is why you shot him." At first, Chambers said he "never had any interaction" or saw Hood that night. But later, Chambers told the detectives, "I remember now! . . . They were fucking with me." Chambers said that "two guys" were "trailing me, you know, to my car and talking shit, . . . calling me names and stuff . . . . Some of it was racial." Because Hood and Vause were trying to get into his car and "attack[ ] him," Chambers said he "pulled the gun" out and shot Hood. Chambers said he "never seen those guys before."

CHAMBERS: And I went to get in my car, you know, like in, you know, like they tried to, you know, like get in the car with me.

STEIGER: They tried to get in the passenger side or...?

CHAMBERS: And, and I think that's, that's when it happened.

STEIGER: Okay. So what happened?

CHAMBERS: That, that must've been, you know, when...

STEIGER: So, you pulled the gun and shot right then?

CHAMBERS: Yeah.

STEIGER: Were you sitting in your car when it happened?

7

CHAMBERS:   I can't remember.[4]

Chambers insisted "those guys attacked me right at my car."

STEIGER:   But, but when you say "attacked" describe their activities?

CHAMBERS:   They were trying to get into the car with me.

STEIGER:   Okay.

KASNER:   Did they try to get in the passenger side, driver side? Were you in the driver side or the passenger side?

CHAMBERS:   I got into the driver side and they tried to get into the passenger side.

STEIGER:   But it was locked?

CHAMBERS:   Yeah.

STEIGER:   Okay.  So what happened then?

CHAMBERS:   And I don't remember, you know, what, I don't remember all the events that happened after that.  I never seen those guys before.

Detective Steiger told Chambers that he "did not fire the gun anywhere near [the] car" because the bullet casings from his gun were found on the sidewalk next to Morgan Junction Park.  Chambers said he did not remember getting out of his car and did not remember what happened afterward.  But Chambers said he got out of his car before the "two guys" could get in.  "They opened the door and I came out."  Chambers said he could not drive away because "they were right there in my fucking car."  Chambers did not see a weapon but "thought they had, you know, like a weapon or something" and

---

[4] Alterations in original.

were "upset with me because of who I was." Chambers told the detectives that "from that point on, I don't remember."

CHAMBERS: And you know, between the Feedback and my car, you know, these clowns were fucking with me.

STEIGER: Right.

CHAMBERS: And I opened my car up and they tried to get into the car with me.

STEIGER: Okay.

CHAMBERS: And that, that's it.

STEIGER: You don't remember grabbing your gun?

CHAMBERS: I don't remember that part.

After the interview, the police examined the BMW. The detectives did not "see any signs of a disturbance" consistent with Chambers' claim. Detective Tim Devore looked specifically for "signs, indications of an attack that occurred at the passenger side of the vehicle." Detective Devore "found no scratches or rubs, marks, or fingerprints."

The State charged Chambers with murder in the second degree of Hood while armed with a .45 caliber semiautomatic handgun in violation of RCW 9A.32.050(1)(a) and (b) and RCW 9.94A.533(3). The State alleged, in pertinent part:

That the defendant LOVETT JAMES CHAMBERS, AKA CIDRICK MANN in King County, Washington on January 21, 2012, while committing and attempting to commit the crime of Assault in the Second Degree, and in the course of and in furtherance of said crime and in the immediate flight therefrom, and with intent to cause the death of another person, did cause the death of Michael Travis Hood, a human being, who was not a participant in said crime, and who died on or about January 22, 2012.

Chambers asserted a claim of self-defense.

9

Before trial, Chambers filed a motion to suppress the evidence seized from his house and the statements he made to Detective Steiger and Detective Kasner. The court denied the motion to suppress the evidence seized from the house. The court concluded the police "were authorized to enter the house to conduct a protective sweep to ensure their safety." The court denied the motion to suppress the statements Chambers made to Detective Steiger and Detective Kasner. The court concluded his "right to remain silent [was] scrupulously honored" under Michigan v. Mosley, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975).

The seven-week jury trial began on February 19, 2014. The State called a number of witnesses including Feedback Lounge employees, Vause, the medical examiner, a Washington State Patrol firearm expert, a Washington State Patrol Toxicology Laboratory forensic toxicologist, witnesses to the shooting, and Seattle police officers and detectives. The court admitted into evidence more than 200 exhibits including photographs, maps, and the interview with Chambers. The State played the hour-long videotaped interview of Chambers for the jury.

Feedback Lounge bartender Alison Hill testified that "Cid" had been a regular at the bar "for years." "[H]e would come in around [5:00] almost every day" and "[h]e always got a vodka martini." Feedback Lounge bartender Leslie Johnston testified Chambers was "already there when I started my shift" at 5:00 p.m. on January 21. The last drink Johnston served Chambers was a "chilled shot of Ketel One." Johnston testified Chambers was "drinking more than usual" that night.

Feedback Lounge server Rebecca Davis testified Chambers was "usually there with a martini in hand" when she arrived for the 5:00 shift and he "would usually have

10

another before he left." But on "[t]his particular night [Chambers] had been there for a few hours, which was unusual." Davis testified she served Vause and Hood that night and they were "polite . . . . [T]hey weren't obnoxious."

Vause testified he felt no effects from the small amount of marijuana he smoked earlier in the evening. Vause testified he noticed Chambers "standing by the front door" when they left the Feedback Lounge.

After they left, Vause and Hood started walking to his truck that was parked near Morgan Junction Park. Vause testified they "both paused" when they reached the alleyway between the Feedback Lounge and the Beveridge Place Pub. As Vause continued walking toward the truck, Hood veered off to the left down the alley. Vause turned around and said, "Trav, what the hell you doing, nigga, the truck's down here." Hood "answered me, and still puzzled by it to this day, why he like stuttered; he was like oh, oh, okay. That was his answer to me." Vause said Hood "went at an angle towards me and proceeded towards the truck as well."

Vause testified their use of the term "nigga" was not racist.

> Q     Okay. And why do you say you call each other nigga and not nigger? Explain that to us. What's the difference in your mind between nigga and nigger?
> A     A nigga to me is my home boy, my friend, my acquaintance, someone associated with me. You know, that's — it's no different than my dude or my home boy or saying different, same exact meaning.
> . . . .
> Q     How about the word nigger?
> A     That's not a cool word. That's a totally racially motivated word as far as I'm concerned.
> . . . .
> Q     Did Travis, when he was speaking with you, did he use the same kind of language?
> A     Absolutely. We're basically from the same area, so yeah, it was their natural way of talking.

11

Because it was cold and windy, Vause walked quickly to the truck and did not wait for Hood to catch up or "pay[ ] any attention" to what Hood was doing. A large utility van was parked in front of the truck and a backhoe was parked at the rear of the truck. The driver's side of the truck faced the street and the passenger side faced the sidewalk in front of Morgan Junction Park.

Vause saw Hood walking up the sidewalk and then Chambers "came into the view, but he was behind a little ways. He was a good six feet, maybe potentially eight feet behind" Hood. Vause said Hood was "walking his normal . . . strolled slow style."

Vause testified that when Hood was about eight feet away from the truck, he looked over his shoulder and said something to Chambers—"[Hood] looked over his left shoulder, and I saw his mouth move, but I didn't hear what was said." Vause testified Hood did not appear angry.

> No negativity. I didn't see any type of tension, or again by Travis being so nonchalant to just casually look over his shoulder and just keep proceeding to the truck, I figured — well, obviously I wouldn't turn my back to somebody I was talking trash to. Who does that?
> . . . .
> . . . [A]s far as the body language, the fact that he was talking facing me and talking to somebody behind him and not worried about that person behind him made me feel like there wasn't anything to be worried about by what he was saying.

Vause said Hood walked to the passenger side of the truck and pulled the door open. Because of the recent snowstorm, Vause had a 4-foot-10-inch flathead shovel in the back of his truck. Hood grabbed the shovel from the truck and "held it in . . . a right-handed batter's stance" with his left shoulder facing Chambers. Vause testified Hood said something to Chambers like, "[W]hat are you trying to do now?" or "back up off me,

12

mother fucker." But Hood did not advance or swing the shovel at Chambers. Chambers jumped back 9 to 10 feet away from Hood.

Hood then yelled at Vause, "[N]igga, watch out, he's got a gun," and Hood "pretty much just spun and turned to try to get into the truck." Vause "saw the first flash from the first gun fire."

> When [Hood] said, watch out, nigga, he's got a gun, as fast as that sentence was finished, the first flash rang out, and I was in motions of going out. I just saw out of my right peripheral the flash from the first gun fire.

Vause "jumped out the driver's door and dove behind the — I stayed down below the bed of my truck hiding." Vause said he was "[d]irectly in the path of the bullets" and as he dove behind the truck, he heard Chambers fire two more shots.

After "the gun fire stopped," Vause "st[u]ck [his] head back up" and saw Chambers put the gun inside his jacket and "casually walk[ ] away" back toward the Feedback Lounge.

Hood was facedown on the passenger seat of the truck and "[t]here was blood all over."

> When I stood up, [Hood] had fell inside of the truck, kind of like he got his left leg on the seat and the hind cheek was landed on the seat, and then he kind of fell across the seat, where basically his face is where my behind would be sitting on the driver's side. . . . There was blood all over inside my truck. There was blood spatter everywhere.

Vause lifted Hood up. Hood was still conscious. Vause asked Hood what happened. "I lifted him up and I said — the first thing out of my mouth was like what the fuck just happened, what the fuck was that?" Hood said, "I don't know." Hood said, "I

13

don't think I'm going to make it." Vause pulled Hood's legs into the truck and pushed

the shovel out of the truck so he could close the door and get medical help.

> I pulled his legs into the truck, both of them. One leg was still out. One was in. One was out, and he was laying face down. I pushed him back up where he was facing forward and tried to grab the door, didn't realize I was trying to close his leg in the door, I thought, so I get the other leg brought in, and then I'm still trying to shut this door, and it won't close on me, and I'm kind of trippin', why is this not closing? I looked. The handle of the shovel had fell inside there. I couldn't get it to close, so I pushed the shovel; I pushed the shovel handle out and just shut the door and made a U-turn. I thought I was taking him to the hospital.

Vause did not want to delay by calling 911.

> A    The decision [not to call 911] was my friend I felt sure was fixing to die, but I didn't want to die too.
> Q    What do you mean by that?
> A    The way the man glared at me in my eyes when I rose up from behind that truck put a fear in me that I was ready to go.
> Q    Did you believe that you might be shot too?
> A    Absolutely.
> Q    So what did you do?
> A    I hauled — I made a U-turn in my truck and got away from there as quick as possible and went straight to what I thought was the hospital, and but later found out it wasn't a hospital.

Vause testified he did not know what happened between Hood and Chambers

before Hood grabbed the shovel from the back of the truck and confronted Chambers.

King County Medical Examiner Dr. Micheline Lubin testified that Hood died of

"[m]ultiple gunshot wounds." There was a gunshot to his chest, one in his upper back,

and one in his lower back. Dr. Lubin could not determine the order of the gunshots fired

at Hood. But the gunshot wound to the chest was at such a "shallow angle" that it "did

not enter the cavity of the body whatsoever." Dr. Lubin testified that when the gunshot

to the chest occurred, Hood was at an "angle position" and "not facing the shooter."

The bullet "basically tunneled underneath the skin and right above the ribcage" until it

exited the left side of his chest and passed through his upper left arm. Dr. Lubin testified the gunshot to Hood's upper left arm was "not a lethal wound" but "would hurt a lot, and you basically wouldn't have any power to that arm because you've injured your triceps muscle." According to Dr. Lubin, it would have been "difficult" for Hood to hold anything "because you've effectively injured a muscle that allows you to lift and move your arm."

Dr. Lubin testified the two shots that were "straight on from the back" and exited through the front of Hood's body were lethal. The shot to his lower back "lacerated the liver and caused bleeding on the capsule." The shot to his upper back was a "grave wound" that "lacerated" a major heart vessel.

Washington State Patrol firearm expert Kathy Geil testified the .45 caliber Colt was a semiautomatic handgun and "[y]ou need to pull the trigger" to fire each shot. Each trigger pull required four pounds of pressure.

Washington State Patrol toxicologist Asa Louis analyzed the blood sample drawn from Chambers at approximately 3:30 a.m. on January 22. Louis testified Chambers' blood alcohol concentration (BAC) was approximately .20 grams per 100 milliliters, or the equivalent of "8.7 drinks in [his] system" at the time of the blood draw. Louis estimated Chambers' BAC would have peaked around midnight at approximately .25, or the equivalent of "10.8 drinks in the system." Louis testified that alcohol is a "central nervous system depressant[ ]" that "slows down the functionality of the brain."

The State presented the testimony of eyewitness Brian Knight through a videotaped deposition. Knight testified that he and several friends arrived at the Beverage Place Pub between 8:30 and 9:00 p.m. The group sat at a table

approximately 10 feet from the front door of the pub. Thirty minutes later, Knight went outside to smoke a cigarette and walked about 20 feet north to the side of the building facing Morgan Junction Park. Knight testified that he noticed "a red Ford Ranger . . . pointed towards me with the door open . . . [on the] [p]assenger's side." Knight could not see the driver's side of the truck because a van blocked his view.

Knight "heard a commotion" and voices but he "couldn't make out what was said." Knight said he saw a black male wearing a beanie and a dark jacket standing on the sidewalk parallel to the truck "pointed towards the door." The man "whip[ped] out a pistol" and fired "a bunch of shots . . . into the truck." The man then turned and walked toward the Beveridge Place Pub. Knight testified the man was "pretty relaxed for a person [who] just shot someone." Knight testified that he did not see or hear anything unusual happening on the sidewalk near the BMW before the shooting.

Knight signaled his friend Alex Rivet to come outside. Rivet saw a black male put a gun into his jacket and walk to a blue BMW parked in front of the Beveridge Place Pub. Knight and Rivet saw the man get into the BMW, look at his cell phone, and then drive away. Knight walked to the location of the shooting and saw bullet casings and blood on the sidewalk.

Rivet called 911 to report the shooting and the license plate number of the BMW. Rivet testified that while he was in the Beveridge Place Pub, he heard "loud clapping" noises that sounded like gunfire. Rivet said there were quick "pauses" between the clapping noises.

Joel Vandenbrink was driving north on California Avenue SW between 9:30 and 9:45 p.m. Vandenbrink testified he heard a "noise that got [his] attention" on the west

16

side of California Avenue SW. Vandenbrink testified that he saw a "fairly tall" individual wearing "dark clothes" fire several gunshots into a pickup truck.

Feedback Lounge General Manager Gianatta Griffits testified that while she was smoking a cigarette in the alley between the Feedback Lounge and the Beverage Place Pub, she heard what she thought were gunshots. Griffits stated she did not see anything "out of the ordinary" before the gunshots.

A number of witnesses testified on behalf of the defense including Chambers, his friend Pierre Rodrick, and forensic psychologist Dr. Mark Cunningham.

Chambers admitted he shot Hood "outside the Morgan Junction Park." Chambers testified Hood "told me he was going to kill me." Chambers said Hood had a shovel and "I thought he was going to kill me." Chambers testified that he shot Hood to "save my life."

Chambers did not remember "exactly how many martinis" he drank at the Feedback Lounge on January 21, 2012. But Chambers admitted he "consumed way past my limit" and "was feeling it." Chambers said he did not see either Vause or Hood while he was at the Feedback Lounge. Chambers said he had never seen Hood before and did not know his name.

Chambers testified that after he left the bar, he walked north to his car. As he passed the alleyway between the Feedback Lounge and the Beverage Place Pub, Chambers heard two men talking behind him. Chambers said the two men had Southern accents and made racial slurs such as "look at that nigger there, look at the way he's walking. His mammy must have taught him how to walk like that." Chambers

17

testified he was not angry and "assumed that they were drunk." Chambers said he walked out onto California Avenue SW to get in his car.

Chambers testified that after he got into his car, one of the men "yanked open" the passenger-side door and "looked as though he was poised to come into the car." Chambers said the man "made a motion to go to his waistband, and it appeared as though he had what I thought was a knife." Chambers said he reached over and pulled the door shut, then reached under the passenger seat to retrieve his .45 caliber Colt. Chambers testified the other man "came up and was banging on the back of the trunk lid." Chambers said he tried to "get away" but he panicked and "twisted the ignition too hard," causing the antitheft system to prevent the doors from locking and the car from starting. Chambers decided to "get out of the car and try to move further down California Avenue where it was more light."

Chambers testified that when he got out of his car, he could not see the man he thought had a knife. "The only person I could see was the person that had been banging on the rear deck of the trunk," who "had moved away to the curb" and was making "racist comments." Chambers testified he did not go into the Beveridge Place Pub or back to the Feedback Lounge for help because "that's the last place I saw the guy, you know, with the knife was there on the passenger side of my car."

Chambers said he "eas[ed] down the driver's side towards the rear" of the BMW and walked toward Morgan Junction Park "to get into a better lit area." Chambers testified he walked on the west side of the sidewalk "up near the park" so he could "see all around me." Chambers said the man was "parallel" to him walking up the curb-side of the sidewalk. Chambers testified that every time he looked around for the man he

thought had a knife, the man on the curb would "start hollering" racist comments to "get my attention and distract me."

Chamber testified that the man on the curb "suddenly sprinted forward" to a red truck and pulled out a shovel. Chambers said the man "spun around at me and he had the shovel up, you know, like a batter," and "came towards" him and said, "[N]ow I'm going to knock your nigger head off." Chambers "believed that he was going to kill me." Chambers testified that he did not remember pulling out or firing his gun and did not remember how many times he shot Hood. The next thing Chambers remembered was being home when the police arrived.

Chambers testified he did not tell Detective Steiger and Detective Kasner the truth because he did not to trust the police. Chambers described the abuse he suffered while he was in custody at the Indiana Boys' School and his exposure to violence while in prison from 1966 until 1989.

Clinical and forensic psychologist Dr. Mark Cunningham testified on behalf of the defense. Based on his interview with Chambers, Dr. Cunningham described the "traumatic experiences" Chambers had with police and law enforcement officials during his youth and exposure to violence during his incarceration at the Los Angeles County Jail, the California Department of Corrections, and the Federal Bureau of Prisons.

Dr. Cunningham testified these "experiences and exposures resulted in posttraumatic stress disorder . . . in Cid, as well as deep-seated distrust of law enforcement and the correctional system." Dr. Cunningham testified that "it is not surprising, given his prior exposures to law enforcement and correctional officers, Cid would respond evasively when interrogated."

19

Dr. Cunningham testified that "if the shooting occurred as Cid Chambers described," Chambers would have believed he was in imminent danger of death when he shot Hood, and "[t]his tendency would be increased by the judgment impairments associated with intoxication."

> I believe, to a reasonable psychological certainty, that Cid's posttraumatic stress disorder and the actions of Michael Travis Hood and Jonathan Vause could have caused Cid to believe he was in imminent danger of death or great personal injury when he shot Mr. Hood.

Dr. Cunningham conceded his opinion was contingent on the accuracy of what Chambers told him. Dr. Cunningham testified posttraumatic stress disorder did not excuse the shooting or mean Chambers did not know what he was doing that night. "I believe that to the best of my knowledge he knew what he was doing." Dr. Cunningham testified that Chambers' "ability to think quickly and clearly that night was affected by alcohol." Dr. Cunningham testified Chambers was not delusional but "certainly paranoid" and "exhibits the symptoms of paranoia."

At the conclusion of the evidence, the State requested the court instruct the jury on the lesser included offense of manslaughter in the first degree. The defense objected to giving a manslaughter instruction. The defense argued there was no evidence Chambers acted recklessly when he shot and killed Hood in self-defense. The court ruled the evidence supported giving the lesser included manslaughter instruction. "[A] jury could find that he acted in self-defense, but because he fired three shots that was more force than is necessary and he acted recklessly."

The court instructed the jury to consider the lesser included offense of manslaughter in the first degree if they did not find beyond a reasonable doubt that

Chambers committed murder in the second degree. Jury instruction 14 states:

> The defendant is charged with Murder in the Second Degree. If, after full and careful deliberation on this charge, you are not satisfied beyond a reasonable doubt that the defendant is guilty, then you will consider whether the defendant is guilty of the lesser crime of Manslaughter in the First Degree. When a crime has been proved against a person, and there exists a reasonable doubt as to which of two or more degrees that person is guilty, he or she shall be convicted only of the lowest degree.

The jury found Chambers guilty of manslaughter in the first degree. By special verdict, the jury found Chambers was armed with a firearm at the time he committed the crime. The court imposed the low-end standard range sentence of 78 months plus the mandatory consecutive 60-month firearm enhancement.

ANALYSIS

Instruction on Lesser Included Offense of Manslaughter

Chambers contends the evidence does not support the decision to instruct the jury on the lesser included offense of manslaughter in the first degree.

Under RCW 10.61.006, a defendant "may be found guilty of an offense the commission of which is necessarily included within that with which he or she is charged in the indictment or information." Either the prosecutor or the defense can request a lesser included offense instruction. State v. Tamalini, 134 Wn.2d 725, 728, 953 P.2d 450 (1998).

A party is entitled to a jury instruction on a lesser offense if (1) the elements of the lesser included offense are a necessary element of the charged offense and (2) the evidence supports an inference that the lesser offense was committed. State v. Workman, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978).

21

Here, the legal prong of the Workman test is met. The elements of manslaughter in the first degree are a necessary element of intentional murder in the second degree. State v. Berlin, 133 Wn.2d 541, 550-51, 947 P.2d 700 (1997); see also State v. Condon, 182 Wn.2d 307, 317-18, 343 P.3d 357 (2015).

We review the trial court's decision regarding the factual prong of the Workman rule for abuse of discretion. State v. Henderson, 182 Wn.2d 734, 743, 344 P.3d 1207 (2015). Under the factual prong, "the court asks whether the evidence presented in the case supports an inference that only the lesser offense was committed, to the exclusion of the greater, charged offense." Condon, 182 Wn.2d at 316.[5] The evidence must "affirmatively establish" the commission of the lesser offense; "it is not enough that the jury might disbelieve the evidence pointing to guilt." State v. Fernandez-Medina, 141 Wn.2d 448, 456, 6 P.3d 1150 (2000). "If a jury could rationally find a defendant guilty of the lesser offense and not the greater offense, the jury must be instructed on the lesser offense." Henderson, 182 Wn.2d at 736. In determining whether the evidence supports an inference that the lesser crime was committed, we review the evidence in the light most favorable to the party requesting the instruction. Fernandez-Medina, 141 Wn.2d at 455-56.

Murder in the second degree requires proof that Chambers acted with the intent to cause the death of Hood. RCW 9A.32.050(1)(a). "A person acts with intent or intentionally when he or she acts with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a). Manslaughter in the first degree

---

[5] Emphasis in original.

requires proof that Chambers recklessly caused the death of Hood. RCW

9A.32.060(1)(a).

> A person is reckless or acts recklessly when he or she knows of and disregards a substantial risk that a wrongful act may occur and his or her disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation.

RCW 9A.08.010(1)(c).

Unlike in State v. Perez-Cervantes, 141 Wn.2d 468, 481-82, 6 P.3d 1160 (2000), affirmative evidence establishes commission of the lesser included offense. Viewed in the light most favorable to the State, the evidence shows Chambers committed the lesser included offense of manslaughter in the first degree. As in State v. Schaffer, 135 Wn.2d 355, 357-58, 957 P.2d 214 (1998), the evidence supports the reasonable inference that Chambers believed he was in imminent danger and acted in self-defense but did so recklessly or negligently by using more force than necessary.

In Schaffer, Schaffer and the victim argued. Schaffer, 135 Wn.2d at 357. During the argument, the victim threatened to kill Schaffer. Schaffer, 135 Wn.2d at 357. When the victim "moved his arm toward his back, Schaffer thought he was reaching for a gun." Schaffer, 135 Wn.2d at 357. Schaffer shot the victim five times, two times in the back and three times in the legs. Schaffer, 135 Wn.2d at 357. The State charged Schaffer with premeditated murder. The trial court instructed the jury on self-defense but refused to instruct the jury on the lesser included offense of manslaughter in the first degree. Schaffer, 135 Wn.2d at 357. The Supreme Court reversed and remanded for a new trial. Schaffer, 135 Wn.2d at 359. The court held the trial court erred in refusing to instruct the jury on the lesser included offense of manslaughter in the first degree. Schaffer, 135 Wn.2d at 359. The court concluded the evidence showed Schaffer acted

23

in self-defense, but shooting the victim "five times including twice in the back" showed he recklessly or negligently used excessive force to repel the danger he perceived. Schaffer, 135 Wn.2d at 358.

> [A] defendant who reasonably believes he is in imminent danger and needs to act in self-defense, "but recklessly or negligently used more force than was necessary to repel the attack," is entitled to an instruction on manslaughter.

Schaffer, 135 Wn.2d at 358 (quoting State v. Jones, 95 Wn.2d 616, 623, 628 P.2d 472 (1981)).

Here, a jury could reasonably find Chambers recklessly or negligently used more force than necessary. Chambers was standing 6 to 8 feet away from Hood when Hood reached the pickup truck, grabbed the 4-foot-10-inch shovel from the back of the truck, and held it in a "batter's stance." Chambers testified that he believed Hood was "going to kill me."

Vause testified that after Hood grabbed the shovel, Chambers jumped back and was standing approximately 9 to 10 feet away from Hood. Vause testified that Hood did not advance or swing the shovel at Chambers. When Chambers pulled out a gun and pointed it at Hood, Hood yelled at Vause, "[W]atch out, he's got a gun." Vause testified that as Hood "spun and turned to try to get into the truck," Vause saw the flash from the first shot.

The testimony of the medical examiner established the gunshot wound to Hood's chest occurred when Hood was standing at an "angle position" and "not facing the shooter." The medical examiner testified the bullet to the chest exited the left side of his chest, passed through his upper left arm, and was not fatal. After that shot, Hood "wouldn't have any power to that arm" and it would have been "difficult" for Hood to hold

anything. Yet, after firing the first shot that went through Hood's arm, Chambers fired two lethal shots directly into Hood's back. Each shot required a separate pull of the trigger.

A jury could reasonably find Chambers acted recklessly or negligently by firing the two fatal shots directly into Hood's back after he turned away and could no longer hold the shovel. The court did not abuse its discretion in deciding to instruct the jury on the lesser included offense of manslaughter in the first degree.

Motion to Suppress Evidence Seized from the House

Chambers contends the court erred in denying his motion to suppress the evidence the police seized from his house: the Colt .45, a magazine clip with .45 caliber bullets, and the keys to the BMW.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution prohibit a warrantless search and seizure unless the State demonstrates that one of the narrow exceptions to the warrant requirement applies. Katz v. United States, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009); State v. Hendrickson, 129 Wn.2d 61, 70-71, 917 P.2d 563 (1996).

One recognized exception to the warrant requirement is a "protective sweep" of the home. Maryland v. Buie, 494 U.S. 325, 327, 334, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990).[6] The Supreme Court describes a "protective sweep" as a limited cursory

---

[6] Because Chambers does not argue a different analysis applies under the state constitution, we address only the federal constitutional analysis. See State v. Reichenbach, 153 Wn.2d 126, 131 n.1, 101 P.3d 80 (2004).

search incident to arrest and conducted to protect the safety of police officers or others.

Buie, 494 U.S. at 327.

> A "protective sweep" is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.

Buie, 494 U.S. at 327.

The Court identifies two different circumstances that justify a protective sweep. The Court held incident to the arrest of a suspect in his home, "as a precautionary matter and without probable cause or reasonable suspicion," the police could "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Buie, 494 U.S. at 330, 334. But the Court cautions the protective sweep does not amount to "a full search of the premises." Buie, 494 U.S. at 335. The second type of protective sweep requires "articulable facts" to support the presence of another person who might pose a threat to the police. Buie, 494 U.S. at 334.

> Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

Buie, 494 U.S. at 334.

We review denial of a motion to suppress to determine whether substantial evidence supports the findings of fact and whether the findings support the conclusions of law. Garvin, 166 Wn.2d at 249. Where, as here, findings of fact are not challenged, we treat the findings as verities on appeal. State v. Levy, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006). We review the conclusions of law de novo. Levy, 156 Wn.2d at 733.

26

The unchallenged findings establish that approximately an hour after the shooting, the police arrested Chambers at his home in West Seattle at 10:49 p.m. The front door of the small one-story house "opens onto a small uncovered front porch." When the police officer knocked, Chambers "opened the door and stepped out onto the porch." The police immediately took Chambers "into custody, handcuffed [him], and patted [him] down for weapons." The police escorted Chambers "down the porch stairs and seated [him] on the front bumper of a police car."

After his arrest, the front door remained open and the police could see a woman, later identified as Sara Chambers, in the living room. "The front door of the house opens directly into the living room of the house. . . . The entry to the kitchen is approximately 20 feet from the front door."

At least four police officers entered the house to perform "a cursory sweep for other suspects." In the kitchen, Officer Marie Gochnour saw "a .45 caliber handgun, car keys, [and] a bullet magazine" on a table. After obtaining a search warrant, the police seized the gun, the magazine clip, and the keys to the BMW.

The court denied the motion to suppress. The court relied on a footnote in State v. Hopkins, 113 Wn. App. 954, 959 n.3, 55 P.3d 691 (2002), to conclude Buie allowed the police to conduct a protective sweep incident to arrest "when a suspect is arrested just outside his home."

> The Buie rule has been extended to include protective sweeps within a suspect's home when a suspect is arrested just outside his home. While there is no Washington authority specifically adopting this extension in Washington, in State v. Hopkins the court twice cited U.S. v. Henry, 48 F.3rd 1282, 310 U.S. App D.C. (C.A.D.C., 1995) which extended the Buie rule to allow protective sweeps of a defendant's residence when the arrest is made just outside the suspect[']s residence.

The footnote in <u>Hopkins</u> states, in pertinent part:

> <u>Buie</u> specifically addressed an arrest inside a person's home, but other courts have expanded its rationale to areas just outside a residence. <u>See</u> <u>United States v. Henry</u>, 48 F.3d 1282, 1284 (D.C. Cir. 1995).

<u>Hopkins</u>, 113 Wn. App. at 959 n.3.

The court erred in concluding the police had the authority to conduct a protective sweep of the house incident to arrest for two reasons. First, a warrantless search of "spaces immediately adjoining the place of arrest"[7] without probable cause or reasonable suspicion does not apply when the police arrest an individual outside his home. <u>See</u> <u>United States v. White</u>, 748 F.3d 507, 511-12 (3d Cir. 2014) (holding the <u>Buie</u> "prong 1 exception is not available where the arrest took place 'just outside the home' "); <u>United States v. Archibald</u>, 589 F.3d 289, 296-97 (6th Cir. 2009) (arrest just outside threshold of front door does not meet first prong of <u>Buie</u>). If an individual is arrested just outside his home, a protective sweep " 'must be analyzed under the second prong of the <u>Buie</u> analysis.' " <u>White</u>, 748 F.3d at 512 (quoting <u>Sharrar v. Felsing</u>, 128 F.3d 810, 824 (3d Cir. 1997)); <u>see also</u> <u>United States v. Paopao</u>, 469 F.3d 760, 765-66 (9th Cir. 2006); <u>United States v. Oguns</u>, 921 F.2d 442, 446 (2d Cir. 1990).

Second, the footnote in <u>Hopkins</u> does not support the court's conclusion that a protective sweep incident to arrest applies. The case cited in the footnote in <u>Hopkins</u>, <u>United States v. Henry</u>, did not rely on the <u>Buie</u> exception for a protective sweep incident to arrest. In <u>Henry</u>, the court relied on the exception for a protective sweep where police have articulable facts that an individual poses " 'a danger to those on the arrest scene.' " <u>Henry</u>, 48 F.3d at 1284 (quoting <u>Buie</u>, 494 U.S. at 334). In <u>Henry</u>, the "[u]ncontroverted testimony at the suppression hearing . . . established an objective

---

[7] <u>Buie</u>, 494 U.S. at 334.

basis for the officers to fear for their safety after the arrest . . . just outside the open door" and to conduct a protective sweep of the apartment. Henry, 48 F.3d at 1284.

In the alternative, the trial court concluded the police were justified in conducting a protective sweep of the kitchen because they had "a reasonable suspicion" that "the area to be searched may harbor an individual posing a danger."

> Buie also allows the police to make a search of areas not directly adjoining the place of arrest when the police have a reasonable belief, based on articulable facts, which warrant a reasonably prudent officer in believing that the area to be searched may harbor an individual posing a danger to those on the arrest scene.
>
> . . . . Alternatively, the officers were authorized to conduct the sweep of the kitchen because they had a reasonable suspicion at the time of the arrest, that Chambers or another person in the house could have access to the yet undiscovered weapon and pose a danger to them. These articulable facts were a) the officers at the time of the sweep knew that the defendant was a suspect in a serious shooting incident involving a gun; b) the officers did not know where the gun was; and c) the officers knew there was someone else in the house.

To justify a protective sweep when a suspect is arrested outside his home, there must be articulable facts that warrant a police officer in believing "the area to be swept harbors an individual posing a danger to those on the arrest scene." Buie, 494 U.S. at 334.[8] To establish the second type of a protective sweep is justified, more than a general suspicion of the possibility of danger is required. See Buie, 494 U.S. at 334 n.2 ("Even in high crime areas, where the possibility that any given individual is armed is significant, . . . reasonable, individualized suspicion [is required] before a [protective sweep] can be conducted."); United States v. Moran Vargas, 376 F.3d 112, 116 (2d Cir. 2004) (general suspicion, "without more", that other armed individuals might be in hotel room insufficient to justify protective sweep); United States v. Taylor, 248 F.3d 506, 514

---

[8] Emphasis added.

(6th Cir. 2001) (generalized suspicion that defendant is a drug dealer, standing alone, inadequate to justify protective sweep).

The record does not support the conclusion that there were "articulable facts" that the kitchen harbored "an individual posing a danger." The police had information that only Chambers shot Hood and was alone when he drove away. The findings establish the only individual in the house when police arrested Chambers was his spouse Sara. "[T]he front door was open" after the arrest and "[t]he police could see" Sara was sitting on the living room couch watching television and remained in the living room.

We conclude the undisputed facts do not support the warrantless entry and protective sweep of the kitchen under Buie and the court erred in denying the motion to suppress.

The State argues even if error, admission of the gun, the magazine clip, and the BMW keys was harmless beyond a reasonable doubt. Constitutional error is presumed prejudicial and the State bears the burden of showing the error was harmless beyond a reasonable doubt. State v. Whelchel, 115 Wn.2d 708, 728, 801 P.2d 948 (1990); State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). In determining whether the error is harmless, "we must 'conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error.' " State v. Brown, 147 Wn.2d 330, 341, 58 P.3d 889 (2002) (quoting Neder v. United States, 527 U.S. 1, 19, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)).

We conclude that absent the evidence seized from the house, the overwhelming untainted evidence leads to a finding of guilt beyond a reasonable doubt and the jury

verdict would have been the same absent the error. Chambers testified he acted in self-defense when he shot Hood with the Colt .45. Chambers admitted that he parked his BMW in front of the Beveridge Place Pub on January 21, that he kept a .45 caliber gun under the passenger seat of the BMW, and that he used the Colt .45 to shoot Hood near Morgan Junction Park.

Motion to Suppress Interview with the Detectives

Chambers contends the court erred in denying his motion to suppress the statements he made in the interview with Detective Steiger and Detective Kasner. Chambers asserts the detectives did not "scrupulously honor" his Fifth Amendment right to remain silent. U.S. CONST. amend. V.

The Fifth Amendment provides, in pertinent part, "No person shall be . . . compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.

In Miranda v. Arizona, 384 U.S. 436, 473-74, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the Supreme Court adopted "[p]rocedural safeguards" to protect the privilege and held that before questioning an individual in custody, the police must clearly inform the suspect:

> [T]hat he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Miranda, 384 U.S. at 478-79.

The Court held that after warnings have been given, "the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." Miranda, 384 U.S. at 479. However, if a suspect in custody invokes his right to remain silent, law enforcement officers must cease interrogation. At that point,

the suspect "has shown that he intends to exercise his Fifth Amendment privilege." Miranda, 384 U.S. at 473-74. "Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." Miranda, 384 U.S. at 474.

In Michigan v. Mosley, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975), the Court addressed whether the decision in Miranda bars police from questioning a suspect after invocation of the right to remain silent. The Court held it did not.

> The Miranda opinion can[not] sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.

Mosley, 423 U.S. at 102-03.

The Court concludes a per se prohibition on further interrogation "would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." Mosley, 423 U.S. at 102. The Court states that the intent of Miranda was to adopt a " 'fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored.' " Mosley, 423 U.S. at 103[9] (quoting Miranda, 384 U.S. at 479). The Court reiterates the "critical safeguard" of Miranda is "a person's 'right to cut off questioning.' " Mosley, 423 U.S. 103 (quoting Miranda, 384 U.S. at 474).

> Through the exercise of his option to terminate questioning [the suspect] can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law

---

[9] Alteration in original.

enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting.

Mosley, 423 U.S. at 103-04.

Therefore, the Court holds that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" Mosley, 423 U.S. at 104 (quoting Miranda, 384 U.S. at 474, 478-79).

After reviewing "the circumstances leading to Mosley's confession," the Court concluded the police "'scrupulously honored'" his "'right to cut off questioning.'" Mosley, 423 U.S. at 104 (quoting Miranda, 384 U.S. at 478-79, 474). The police gave Mosley "full 'Miranda warnings' . . . at the very outset of each interrogation" and "subjected him to only a brief period of initial questioning." Mosley, 423 U.S. at 106-07. After Mosley exercised his right to remain silent, the police "immediately ceased the interrogation." Mosley, 423 U.S. at 104. The police resumed questioning only after "the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." Mosley, 423 U.S. at 106. By contrast, the Court emphasized:

> This is not a case . . . where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear

33

down his resistance and make him change his mind.

Mosley, 423 U.S. at 105-06.[10]

We review a trial court's findings of fact following a CrR 3.5 hearing for substantial evidence and review de novo whether the findings support the conclusions of law. State v. Radcliffe, 164 Wn.2d 900, 907, 194 P.3d 250 (2008); State v. Broadaway, 133 Wn.2d 118, 131, 942 P.2d 363 (1997); State v. Duncan, 146 Wn.2d 166, 171, 43 P.3d 513 (2002).

Here, following the CrR 3.5 hearing and review of the videotaped interview, the trial court concluded the detectives scrupulously honored Chambers' right to remain silent; and Chambers "knowingly, voluntarily, and intelligently waived his rights" and agreed to talk to the detectives. The conclusions of law state, in pertinent part:

> . . . . Pursuant to Michigan v. Mosley, . . . after a suspect asserts the right to remain silent, police may re-contact the suspect to see if he wants to talk if the original assertion of the right to remain silent is scrupulously honored. "Scrupulously honored" means the police must honor the request at the time it is made and must not persist in repeated efforts to get the defendant to talk. Here, at the time the detectives initiated conversation after leaving Harborview, defendant had twice been read his Miranda rights. . . . The defendant's statements made in the interview room are admissible because they were made voluntarily.
>
> . . . .
>
> . . . . Based on all the circumstances, the court finds that the defendant's statements to detectives are admissible because his assertions of

---

[10] Likewise, in State v. Wheeler, 108 Wn.2d 230, 238, 737 P.2d 1005 (1987), our Supreme Court held that in determining the validity of a waiver of a previously asserted right to remain silent, the court may consider as relevant factors:

> (1) [W]hether the right to cut off questioning was scrupulously honored; (2) whether the police engaged in further words or actions amounting to interrogation before obtaining a waiver; (3) whether the police engaged in tactics tending to coerce the suspect to change his mind; and (4) whether the subsequent waiver was knowing and voluntary.

his right to remain silent were scrupulously honored and ample time passed between his assertion and the police contacting him.[11]

Chambers contends that contrary to Mosley, the court erred in concluding that "ample time passed" between the assertion of his Fifth Amendment right to remain silent and the questioning by detectives. Chambers asserts the time between when he made the unsolicited statement on the way to Harborview that " 'I don't want to talk about this' " at approximately 3:07 a.m. and when Detective Steiger read Miranda rights to him and said he wanted to "hear [Chambers'] side of the story" at approximately 3:50 a.m. is not a significant period of time under Mosley. Chambers also notes that unlike in Mosley, police questioned him about the same crime.[12]

But Mosley does not prescribe a bright line test to determine whether the right to cut off questioning was scrupulously honored. Although the Court in Mosley states two hours was a "significant period of time", the Court does not suggest a durational limit. Mosley, 423 U.S. at 106.[13] And the federal courts do not treat the nonexclusive factors

---

[11] The conclusions of law also state, in pertinent part:

> . . . After reviewing the video of the defendant's statement to detectives in the interview room, it is clear that the defendant was not coerced into speaking with detectives; there were no threats, promises, or actions on behalf of the police to coerce the defendant to waive his rights. . . . The defendant's responses were controlled. He did not tell detectives anything that he did not want to tell them.

> . . . . Additional indicators that the defendant was not coerced into speaking with detectives include: the defendant did not talk with detectives about many of the topics they wanted to discuss, his body language was relaxed (feet up on the table, sitting in the chair that he wanted).

[12] Chambers cites State v. Brown, 158 Wn. App. 49, 240 P.3d 1175 (2010), to argue the detectives violated Mosley by questioning him on the same crime. In Brown, the court relied on State v. Reuben, 62 Wn. App. 620, 626, 814 P.2d 1177 (1991), to assert questioning on the same crime established the police did not scrupulously honor the right to remain silent. Brown, 158 Wn. App. at 59. But in Reuben, the court held that where the police did not provide fresh Miranda warnings, resumed "interrogation after a very short respite", and questioned the suspect on the same crime, the court erred in finding waiver of the right to remain silent. Reuben, 62 Wn. App. at 626.

[13] The cases Chambers cites do not establish a bright line rule about the amount of time officers must wait before questioning a suspect after invoking the right to silence. See State v. Elkins, 188 Wn. App. 386, 401-02, 353 P.3d 648 (2015); Brown, 158 Wn. App. at 60; State v. Cornethan, 38 Wn. App. 231, 235, 684 P.2d 1355 (1984); State v. Vannoy, 25 Wn. App. 464, 469, 610 P.2d 380 (1980).

the Court considered in Mosley as dispositive. See, e.g., United States v. Schwensow, 151 F.3d 650, 659 (7th Cir. 1998); United States v. Andrade, 135 F.3d 104, 106-07 (1st Cir. 1998); Hatley v. Lockhart, 990 F.2d 1070, 1074 (8th Cir. 1993); United States v. Hsu, 852 F.2d 407, 410 (9th Cir.1988); Jackson v. Dugger, 837 F.2d 1469, 1471-72 (11th Cir. 1988); United States v. Smith, 608 F.2d 1011, 1014-15 (4th Cir. 1979); Wilson v. Henderson, 584 F.2d 1185, 1188-89 (2d Cir. 1978).

For example, in Hsu, the Ninth Circuit adopted an approach that considers all of the relevant factors with no one factor dispositive. Hsu, 852 F.2d at 410.

> Mosley envisioned an inquiry into all of the relevant facts to determine whether the suspect's rights have been respected. Among the factors to which the Court looked in that case were the amount of time that elapsed between interrogations, the provision of fresh warnings, the scope of the second interrogation, and the zealousness of officers in pursuing questioning after the suspect has asserted the right to silence. See Mosley, 423 U.S. at 104-06 . . . . At no time, however, did the Court suggest that these factors were exhaustive, nor did it imply that a finding as to one of the enumerated factors—such as, for example, a finding that only a short period of time had elapsed—would forestall the more general inquiry into whether, in view of all relevant circumstances, the police "scrupulously honored" the right to cut off questioning.

Hsu, 852 F.2d at 410.

The touchstone of the analysis under Mosley is whether a "review of the circumstances" leading up to the statements made to police show the " 'right to cut off questioning' was fully respected." Mosley, 423 U.S. at 104 (quoting Miranda, 384 U.S. at 474).

Here, the undisputed findings support the conclusion that the right to cut off questioning was scrupulously honored. Chambers was arrested at 10:49 p.m. and advised of his Miranda rights at 10:51 p.m. Chambers stated that he understood his rights. When Officer Belgarde asked Chambers if he wanted to speak to police,

Chambers said, "[N]o." Officer Kyle Galbraith drove Chambers to the Southwest Precinct and then to Seattle Police Headquarters. "No questions were asked of the defendant during the trip from his home to the precinct, from the precinct to headquarters." The police placed Chambers in an interview room at Seattle Police Headquarters at approximately 12:28 a.m. "Upon entry into the room," Chambers was "taken out of handcuffs" and "accepted the officer's offer of a glass of water." He was "left alone in the interview room for about two-and-a-half hours." The police did not ask Chambers any questions while at police headquarters.

After obtaining a warrant to draw blood, Detective Steiger and Detective Kasner drove Chambers to Harborview for a blood draw at 3:07 a.m. Detective Steiger and Detective Kasner did not ask Chambers any questions during the trip to Harborview. But on the way, Chambers made the unsolicited statement that " 'I don't want to talk about this.' "

After the blood draw, Chambers "appeared to have substantially sobered up." When they "reached the detective's car at about 3:50 a.m.", Detective Steiger read Chambers his <u>Miranda</u> rights again. Chambers said he understood the rights and did not invoke his right to remain silent. While driving to the jail, Detective Steiger told Chambers that he "wanted to hear [Chambers'] side of the story." Chambers said, " 'Man, I don't even remember what happened. I was just - I don't know what's going on. I don't remember anything that happened tonight.' "

When they arrived at the King County jail, Detective Steiger asked Chambers if he remembered what had happened that night. Chambers said he was trying to remember. Chambers then said, " 'I don't know who this dude is. Do you have a

picture of the dude? I need to see a picture of the guy.' " Detective Steiger said that he had a picture and "asked if they should go back to his office and have a talk." Chambers replied, " 'Yeah, let's go.' " They left the jail and Detective Steiger and Detective Kasner drove Chambers to Seattle Police Headquarters. Before the recorded interview, the detectives read Chambers his <u>Miranda</u> rights. Chambers stated he understood his rights and agreed to talk to the detectives.

Because the circumstances leading up to the interview show the police scrupulously honored Chambers' right to cut off questioning, the court did not err in denying the motion to suppress the statements Chambers made to Detective Steiger and Detective Kasner.

The record shows the police advised Chambers of his <u>Miranda</u> rights at 10:51 p.m. when he was arrested on January 21. Chambers stated he understood his rights and unequivocally said he did not want to talk to the police. The record establishes the police did not "ask the defendant any questions or persist in repeated efforts to wear him down or change his mind after he invoked his rights." After he invoked his right to remain silent at 10:51 p.m. on January 21, the police did not question Chambers while at police headquarters. And while driving to Harborview to obtain a blood draw at 3:07 a.m. on January 22, the detectives did not ask Chambers any questions. Nonetheless, on the way to Harborview, Chambers said he did not want to talk about what happened. While at Harborview, Chambers seemed to have "sobered up." When they left Harborview approximately 45 minutes later, Detective Steiger advised Chambers of his <u>Miranda</u> rights again. Chambers stated he understood his rights and did not invoke the

right to remain silent. We conclude the undisputed facts support the conclusion that the right to cut off questioning was scrupulously honored under Mosley.

Because the remainder of this opinion has no precedential value, the panel has determined it should not be published in accordance with RCW 2.06.040.

Motion to Exclude Deposition Testimony

Chambers contends he is entitled to reversal because the court erred in denying his motion to exclude the deposition testimony of eyewitness Brian Knight on the grounds he was denied his constitutional right to counsel.

The parties agreed to videotape the deposition of Knight and play the video at trial. The attorney representing the King County jail objected to removing Chambers' shackles during the deposition. The attorney argued that as a general rule, the jail does not remove shackles when a defendant is "outside the presence of the judge when it's not the actual trial." And because Chambers "is not the deponent", the jury would not know he was present. The attorney pointed out Chambers was charged with murder in the second degree and booking records showed he "has a history of escape by force and a history of kidnapping."

Defense counsel argued that if Chambers was "in restraints he can't review the impeachment materials . . . because he is not able to move his hands more than several inches away from his body", and "[h]e's not able to take notes in a meaningful way." But the jail sergeant confirmed Chambers would be wearing "[w]aste chains."

The court ruled that Chambers could be restrained during the deposition as long as he could take notes and consult with counsel.

> He may be restrained if as long as he's not restrained behind his back you can restrain him comfortably, give him a notepad, set him up so that he

can take notes. But, I'm not here to overrule the safety policies of the jail. Uh, and so long as he has his Constitutional Rights, and I suggest he does, as long as he's present personally um, then I will abide by the jail policies.

Before trial, Chambers filed a motion to exclude the deposition testimony because the restraints "impeded consultation" with his attorney and violated his constitutional right to counsel. The State filed a response to the motion to exclude.

At the hearing, defense counsel and the prosecutor disagreed about whether Chambers could write and communicate with his attorney during the deposition. The defense argued the restraints prevented Chambers from writing and prevented him from speaking with his attorney without being recorded by the microphone located nearby. The prosecutor disagreed. The prosecutor stated the restraints did not prevent Chambers from writing and there were a number of actions the defense could have taken to resolve any issue with the microphone.

The only evidence presented at the hearing was a copy of the videotaped deposition. Chambers is not visible in the video.

The court ruled that "on this record", it could not resolve the factual dispute about Chambers' ability to write.

> There is a factual dispute as to whether or not Mr. Chambers was able to write. [Defense counsel] proffers that [Chambers] could not write and [the prosecutor] says that it appeared that at least he could hold a tablet and I'm going to set this forward but frankly that's not a factual dispute that I can resolve on this record.

The court ruled the microphone on counsel table was "in the defense control."

> [The microphone] is something that is in the defense control, the issue of the microphone and so I conclude that when the microphone — that the parties could have discussed it and they could have fixed the microphone issue at the beginning. It's nowhere discussed on the record, and it seems to me that they could have taken steps such as putting their hands

over the microphone or done any number of things, and that would have effectuated communication between Mr. Chambers and his counsel.

The court denied the motion to exclude the videotaped deposition of Knight.

The trial court has broad discretion regarding the admission or exclusion of evidence. State v. Swan, 114 Wn.2d 613, 658, 790 P.2d 610 (1990). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. State v. Finch, 137 Wn.2d 792, 810, 975 P.2d 967 (1999). A court abuses its discretion only when no reasonable person would take the view adopted by the trial court. State v. Atsbeha, 142 Wn.2d 904, 913-14, 16 P.3d 626 (2001).

The court did not abuse its discretion in ruling the record was inadequate to determine whether the restraints interfered with Chambers' ability to consult with his attorney during the deposition. Chambers made no offer of proof and presented no evidence to support the assertion that he was unable to write or communicate with his attorneys. See State v. Mee Hui Kim, 134 Wn. App. 27, 42-43, 139 P.3d 354 (2006) (concluding court did not abuse its discretion in ruling on motion in limine where defendant presented no evidence to support the motion to exclude).

And the court did not abuse its discretion by concluding defense counsel could have resolved any concerns about the microphone located near defense counsel. See State v. Gonzales-Morales, 138 Wn.2d 374, 386, 979 P.2d 826 (1999) (no abuse of discretion where defendant controlled the ability to communicate with his attorney).

Chambers also claims the court erred in allowing the jail to use restraints. The trial court has broad discretion to determine what security measures are necessary. State v. Damon, 144 Wn.2d 686, 691, 25 P.3d 418 (2001). In determining whether the

use of restraints is justified, the court considers a number of factors including the seriousness of the charge, the defendant's temperament and character, his age and physical attributes, his past record, and past attempted escapes. Damon, 144 Wn.2d at 691. The record shows the court's decision to allow restraints that allowed Chambers to take notes and consult with his attorney was not manifestly unreasonable or based on untenable grounds.

Prosecutorial Misconduct

Chambers contends prosecutorial misconduct during closing argument deprived him of the right to a fair trial.

To prevail on a claim of prosecutorial misconduct, a defendant must show the prosecutor's argument was both improper and prejudicial. State v. Warren, 165 Wn.2d 17, 26, 195 P.3d 940 (2008). An abuse of discretion standard applies to allegations of prosecutorial misconduct. State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). It is improper to disparage defense counsel's role or to impugn his integrity. State v. Thorgerson, 172 Wn.2d 438, 451, 258 P.3d 43 (2011). Improper statements must "fundamentally undermine defense counsel's role or integrity." Lindsay, 180 Wn.2d at 433.

We review allegedly improper comments in the context of the entire closing argument, the issues presented, the evidence addressed, and the instructions given to the jury. State v. Russell, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994). The defendant must show the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). But if the defendant does not object at trial, any error is waived unless the

42

prosecutorial misconduct is so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. Emery, 174 Wn.2d at 760-61.

The prosecutor "is entitled to make a fair response to the arguments of defense counsel" during rebuttal argument. State v. Gauthier, 189 Wn. App. 30, 37-38, 354 P.3d 900 (2015); State v. Gregory, 158 Wn.2d 759, 842, 147 P.3d 1201 (2006); Russell, 125 Wn.2d at 87. Even if the remarks made during rebuttal are improper, they are not grounds for reversal " 'if they were invited or provoked by defense counsel and are in reply to his or her acts and statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective.' " State v. Weber, 159 Wn.2d 252, 276-77, 149 P.3d 646 (2006) (quoting Russell, 125 Wn.2d at 86); Gauthier, 189 Wn. App. at 38.

Chambers asserts that during rebuttal argument, the prosecutor disparaged his attorney by stating the defense was "trying to pander to your prejudices" and "make it so that your prejudice against racism clouds your judgment." The remarks were a fair response to the closing argument of defense counsel.

During the defense closing argument, the attorney focused on the topic of racism. The defense attorney argued Vause and Hood were racists "trying to commit a hate crime against" Chambers.

> Make no mistake about it. What happened out there that night, that Mr. Vause and Mr. Hood following Mr. Chambers to his car, that was a hate crime. They were trying to commit a hate crime against him, and if Mr. Chambers hadn't defended himself, that hate crime would have been completed either as a homicide or as a vicious beating. And the State brought you the word of a racist to try to prove beyond a reasonable doubt that this wasn't a hate crime.

The defense attorney argued use of the word "nigger" undermined Vause's claim that he was not a racist.

> I was certainly raised that the word nigger is a word with history, it's a word of violence, and that maybe within the African American community there's some people who think maybe the word can be used in some contexts, maybe it shouldn't; it is 2014. There is no reason any white person should be using that word, and Mr. Vause is up here protesting he's not a racist.

The attorney pointed to the testimony of another witness to argue Hood "is even worse" than Vause and "every other word out of his mouth is the N word."

> We also hear from Tara Marler; if anything, Mr. Hood is even worse. We heard from Ms. Marler about these two occasions shortly before this incident, how Mr. Hood is loud, he's hyped up, every other word out of his mouth is the N word, as Ms. Marler says it. He's talking about, you know, assaults, fights he's been in, all these kinds of things.

In rebuttal, the prosecutor argued the defense "has clearly tried to make this case about race" and "pander to your prejudices."

> The defense in this case has clearly tried to make this case about race. They have portrayed Jonathan Vause and Travis Hood as racists, and yet strangely the defense has argued all along, has told you that the defendant was not troubled by the racist slurs that he claims those two men told him. That didn't bother him. He told the police, it was like water off a duck's back. It didn't bother him. So the question you need to ask is why then has the defense made this a case about race.
> The reason they have made it a case about race is because they're trying to pander to your prejudices.

The court overruled the defense objection.

The prosecutor argued the defense is "trying to make it so that your prejudice against racism clouds your judgment." The prosecutor said the State "is asking you to refuse to let your abhorrence of racism get in the way of a rational view of the evidence

in this case."

> They're trying to make you not use your rational thought processes. They're trying to make it so that your prejudice against racism clouds your judgment.
> The State in this case is not asking you — asking you to tolerate racism. The State is asking you to refuse to let your abhorrence of racism get in the way of a rational view of the evidence in this case.

In context, the challenged remarks were a fair response to the defense closing argument and did not impugn the integrity of defense counsel.

Chambers also argues the prosecutor's reference during rebuttal argument to an "equity defense" and use of the word "fooled" were improper "accusations that [defense] counsel was using improper deception on Chambers' behalf."

In rebuttal, the prosecutor argued Dr. Cunningham's testimony about Chambers' "rough life" and the defense argument that "the man that was killed was a racist" was an attempt to present an "equity defense" and urged jurors not to "be fooled."

> Regarding Dr. Cunningham, you know, large parts of what Dr. Cunningham testified to really went to they were trying to make it into an equity defense. The defendant's had a rough life. . . . Dr. Cunningham testified that it was terrible things that happened to the defendant and his years in prison. He suffers from [posttraumatic stress disorder], and then you heard that the man that was killed was a racist. Don't be fooled.

The court overruled the defense objection.

The prosecutor then said, "Look at the evidence that you actually have in front of you, . . . what does the defendant's past" and Vause and Hood's use of "the N word . . . really have to do with what happened?"

> Don't be fooled. Look at the evidence that you actually have in front of you, and what does the defendant's past, the defendant's hard life, and even if Jonathan and Jamie did use the N word among themselves, what

45

does that really have to do with what happened on the 21st of January, 2012? What does it really have to do?

Defense counsel did not object.

In Thorgerson, the court concluded the prosecutor impugned the integrity of defense counsel by "referring to his presentation of his case as 'bogus' and involving 'sleight of hand.'" Thorgerson, 172 Wn.2d at 451-52. The court concluded use of the phrase "sleight of hand" implied "wrongful deception or even dishonesty." Thorgerson, 172 Wn.2d at 452. But the court concluded the misconduct was not likely to alter the outcome of the trial. Thorgerson, 172 Wn.2d at 451-52.

Here, the prosecutor's reference to an "equity defense" did not "fundamentally undermine defense counsel's role or integrity." Lindsay, 180 Wn.2d at 433. While urging the jury not to "be fooled" arguably implied deception, the argument was in pertinent reply to the defense closing argument, and the remark was not likely to alter the outcome of the trial. Thorgerson, 172 Wn.2d at 452.

We affirm the jury verdict.

WE CONCUR:

46