# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 50266-6-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| QUEZON LUCAS POOR THUNDER, AKA QUEZON LUCAS WILDSPIRIT, QUEZON LUCAS PENSON, QUEZON LUCAS POOR-THUNDER, QUEZON LUCAS POORTHUNDER, | |
| Appellant. | |

MAXA, C.J. – Quezon Poor Thunder appeals his convictions of four counts of second degree child rape.

We hold that (1) the trial court did not err in denying Thunder's requests to represent himself because the court could not ascertain whether his waiver of the right to counsel was knowing and intelligent due to Thunder's persistent refusal to meaningfully answer the court's questions; (2) the trial court did not violate the CrR 3.3 time for trial requirements because each of the continuances granted was proper; (3) the trial court did not violate Thunder's constitutional speedy trial right because the length of the delay was not disproportionate to the needs of preparing his case for trial; (4) the community custody conditions prohibiting the use of alcohol, requiring an alcohol and chemical dependency evaluation, and prohibiting access to the Internet were improperly imposed, but conditions prohibiting Thunder from entering sex-related businesses, and accessing sexually explicit materials were crime related and therefore proper;

and (5) regarding legal financial obligations (LFOs), the criminal filing fee was improperly imposed on Thunder because he was indigent but Thunder does not show that the DNA collection fee was improperly imposed. We also decline to address Thunder's claims in his statement of additional grounds (SAG) because they do not meaningfully explain how the trial court allegedly erred.

Accordingly, we affirm Thunder's convictions, but we remand for the trial court to strike a portion of community custody condition 11 and community custody conditions 22, 23, and 24 and to strike the criminal filing fee.

## FACTS

The State charged Thunder with four counts of second degree child rape after his girlfriend's 13-year-old daughter reported to law enforcement that he had sexual intercourse with her on at least four separate occasions.

*Thunder's Requests to Represent Himself*

During the time leading up to his trial, Thunder made several statements regarding dismissing his attorney and representing himself. Thunder apparently made his first request to represent himself at his arraignment in March 2016, which was denied.

On October 5, 2016, the court addressed Thunder's request to represent himself. The court attempted a colloquy with Thunder to assess his level of education and any legal training, his ability to prepare for trial, his knowledge of criminal procedure and the rules of evidence, and what he had studied to determine his legal rights. Thunder answered that he had an 11th grade education, but responded to the rest of the court's questions either by stating "I want to represent myself" or by accusing the court of violating his rights. Report of Proceedings (RP) (Oct. 5, 2016) at 6-7. He also denied that any charges had been filed against him.

At the end of this exchange, the trial court stated that given Thunder's responses, "this court does not believe that it can allow [Thunder] to represent himself in this matter because it would be detrimental for him to do so." RP (Oct. 5, 2016) at 9. However, the court later stated, "So we will continue to attempt to inquire into [Thunder's] understanding and ability to articulate the requisite matters before granting him the right of self-representation in this circumstance." RP (Oct. 5, 2016) 18-19.

Thunder appeared before a different judge on November 7, the scheduled trial date. Defense counsel informed the court that Thunder again was requesting to represent himself.

The trial court asked Thunder a series of questions aimed at determining how much he understood about his case and about representing himself at trial. Thunder repeatedly refused to acknowledge that he had been charged with any crime and repeatedly claimed that he would be enslaved if convicted. Specifically, he failed to answer whether he understood the charges against him, the seriousness of the charges, and the fact that he potentially could be incarcerated for the rest of his life if convicted.

When the court asked if Thunder could abide by courtroom rules of procedure as a lawyer would, he replied, "Can you show me a certification of oath that you withhold the rights of my land, instead of trying to push the maritime laws on me?" RP (Nov. 7, 2016) at 8-9. When asked whether his waiver of counsel was the result of any coercion or threats, Thunder replied, "By your system." RP (Nov. 7, 2016) at 9.

After this colloquy, the trial court found that based on Thunder's responses, Thunder did not understand the consequences of his waiver of the right to counsel. Therefore, the court concluded that Thunder's waiver of his right to counsel was not intelligently given and denied his request to represent himself.

A third judge addressed Thunder's request to represent himself on February 28, 2017, shortly before jury selection began.  The issue had been raised in court the day before.

The trial court advised Thunder of the charges against him and stated that he could be sentenced up to life in prison if convicted.  When the court asked Thunder if he understood this risk, he replied "I comprehend that it is a fee that you guys are trying to charge me with and trying to use the jail time to pay the fee off when I have the right to pay the fee off and not do jail time."  RP (Feb. 28, 2017) at 35.  The court again asked if Thunder comprehended how serious the charges were, and Thunder responded, "I comprehend a fee."  RP (Feb. 28, 2017) at 35.

Regarding the conduct of the trial, Thunder stated that he comprehended that the court would treat him like lawyer and would give him no special favors.  Thunder stated that he was familiar with the rules of evidence and rules of criminal procedure, and comprehended that if he testified he would have to break the testimony into questions.

The court stated that if it did allow Thunder to represent himself, the court would appoint his defense counsel as standby counsel and asked Thunder if that would be acceptable.  Thunder failed to answer, instead responding, "Like I said, I'm here as a special appearance."  RP (Feb. 28, 2017) at 43.

The court asked Thunder if he could conduct himself in front of the jury without being disruptive.  Thunder responded that the jury were not his peers because he was Native American, that he did not "grant" the court jurisdiction over him, and that the State could not bring criminal charges against him because it was "a nonliving fictitious entity." RP (Feb. 28, 2017) at 43-44.

The court then stated that self-representation with standby counsel could be a possibility. But the court stated, "I don't want a situation where we're here in the middle of the trial and you're being disruptive."  RP (Feb. 28, 2017) at 46.  Thunder responded by reiterating his

4

assertions that "Washington State is a nonliving fictitious entity that ain't even a real human being as the plaintiff" and asked if the flag was going to take the stand. RP (Feb. 28, 2017) at 46. When the court asked if he was ready to proceed to trial if he represented himself, Thunder responded, "They're not my peers. They may not judge me." RP (Feb. 28, 2017) at 46.

The trial court denied Thunder's motion to represent himself. The court first stated that the motion was untimely. The court then stated that Thunder did not have an adequate understanding of the law, that his waiver of the right to counsel was not knowing or intelligent, and that the court was unable to obtain an assurance from Thunder that his conduct in court would not be an issue.

*Multiple Trial Continuances*

Thunder's arraignment initially was set for March 7, 2016. However, he was apparently so disruptive that he was removed from the courtroom and the arraignment was continued until the next day. The court entered a scheduling order setting the omnibus hearing for April 15 and the jury trial for May 3.

On April 15, both the State and defense counsel requested additional time to prepare for trial. The court entered an order continuing the trial until August 4. Thunder objected to the continuance and refused to sign the order. The new time for trial deadline was September 3.

On June 13, the court set a competency hearing for Thunder at defense counsel's request and over Thunder's objection to take place on June 30. At the June 30 hearing, the court found Thunder competent to stand trial. The court also entered another scheduling order, setting the omnibus hearing for July 25 and moving the trial date up to July 28. Thunder wrote over his signature line acknowledging receipt, "I object under the treat [*sic*] of slavery." Clerk's Papers (CP) at 292.

At the July 25 hearing, both the State and defense counsel requested a trial continuance because the case had been reassigned to a new deputy prosecuting attorney and because defense counsel required time to complete trial preparation. Thunder wrote "I object under slavry [*sic*] treat [*sic*] never sign from attorney" on his signature line. CP at 285. Trial was continued to September 20. The new time for trial deadline was October 15.

The State learned in July that DNA evidence from the rape kit was available to compare to Thunder's DNA. On August 5, the State served Thunder with a warrant for a swab of his DNA. The swab was taken on the same day. Thunder physically resisted. He repeatedly refused to comply willingly, pressing his lips together and turning his head away to prevent officers from swabbing the interior of his cheek. Though Thunder was handcuffed and in leg irons, four officers were required to subdue him sufficiently to collect the sample. Thunder then continued to resist by biting down on the buccal swab and again moving his head away. He finally released the swab after one officer "applied pain compliance to the pressure point near the back of the jaw." CP at 131.

At an August 19 hearing, the parties requested a six day trial continuance because of defense counsel's preplanned vacation and because the State still was waiting on DNA analysis results from the Washington State Patrol (WSP). The court found good cause and granted the continuance, setting trial for September 26, within the time for trial deadline.

At the September 16 status conference, the State informed the court that, despite its efforts to seek updates with the WSP, DNA test results were not yet available. Both parties also were still waiting for Child Protective Services records, which defense counsel wished to review before trial. The court set the matter for status conference and possibly trial on September 26.

6

At the September 26 status conference both the State and defense counsel requested a trial continuance. The State still was waiting for the DNA testing results from WSP. Defense counsel asked for a one-and-a-half week continuance because of his unavailability. The court continued the trial date to November 7 and set a status conference hearing for October 14. Thunder objected and refused to sign the order. The new time for trial deadline was December 7.

The State requested a hearing on October 5 to provide the court with further explanation regarding why the DNA analysis was not yet complete. The State notified defense counsel of the DNA analysis results on October 24.

The parties next appeared on November 7 ready for trial, but the assigned judge was in trial on another case. Thunder also had filed a motion to dismiss for speedy trial violations and the State requested a few days to respond to the motion. The court found good cause to continue the matter two days to November 9 to allow the State time to respond to Thunder's motion.

On November 9, defense counsel stated that he may need to request a trial continuance to have an expert review the DNA evidence. After the hearing, the court entered a scheduling order setting the trial, continuance hearing, and status conference hearing for December 9. Thunder wrote over the copy received signature line "I reserve my rights without prejudice UCC 1-308" and "I'm not the vessel." CP at 293. The court also denied Thunder's motion to dismiss for speedy trial violations. The new time for trial deadline was January 8, 2017.

At the December 9, 2016 status conference, the court continued the trial until February 23 to give the State time to respond to Thunder's request for supplemental discovery regarding the WSP's DNA analysis. The new time for trial deadline was March 25.[1]

The parties were present in court and ready for trial on February 23. Because of court congestion, the trial court placed Thunder's case in trailing status until February 27. The trial began on February 27.

*Conviction and Community Custody Conditions*

Thunder was convicted at trial of all four counts of second degree child rape. The trial court's sentence imposed several post-release community custody conditions. The conditions included requirements that prohibited Thunder from using alcohol, required an alcohol and chemical dependency evaluation, prohibited his Internet usage without approval, and prohibited him from entering sex-related businesses or accessing sexually explicit material.

Thunder appeals his convictions, the imposition of certain community custody conditions, and the imposition of the criminal filing fee and the DNA collection fee.

ANALYSIS

A.    RIGHT TO SELF-REPRESENTATION

Thunder argues that the trial court erred in denying his repeated requests to represent himself. We disagree.

---

[1] There is an apparent scrivener's error on the December 9, 2016 continuance order, incorrectly recording the new time for trial deadline as February 13, 2017, despite the fact that trial was continued to February 23, 2017 at the December 9 hearing. Per CrR 3.3(b)(5), the new time for trial deadline was actually March 25, 2017 (30 days after the continued trial date of February 23).

1.  Legal Principles

Article I, section 22 of the Washington Constitution and the Sixth Amendment to the United States Constitution guarantee a criminal defendant both the right to assistance of counsel and a right to self-representation. *State v. Howard*, 1 Wn. App. 2d 420, 424, 405 P.3d 1039 (2017). The right of self-representation is "so fundamental that it is afforded despite its potentially detrimental impact on both the defendant and the administration of justice." *State v. Madsen*, 168 Wn.2d 496, 503, 229 P.3d 714 (2010).

There is a tension between the right of self-representation and the right to counsel. *State v. Curry*, 191 Wn.2d 475, 482, 423 P.3d 179 (2018). A defendant's request to represent himself or herself waives the right to counsel. *Howard*, 1 Wn. App. 2d at 425. Consequently, self-representation is not an absolute right. *Id.* A trial court must first determine that the defendant's waiver of the right to counsel is voluntary, knowing, and intelligent before allowing self-representation. *Id.* If this waiver is proper, a criminal defendant has a right to represent himself or herself. *Id.*

Preferably, the trial court will determine the validity of a waiver of counsel through a colloquy on the record with the defendant. *Id.* "[T]he trial court should assume responsibility for assuring that decisions regarding self-representation are made with at least minimal knowledge of what the task entails." *City of Bellevue v. Acrey*, 103 Wn.2d 203, 210, 691 P.2d 957 (1984). The trial court must advise the defendant of the potential dangers and disadvantages of self-representation, ensuring that the defendant " 'knows what he is doing and his choice is made with eyes open.' " *In re Pers. Restraint of Rhome*, 172 Wn.2d 654, 659, 260 P.3d 874 (2011) (quoting *Faretta v. California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562

9

(1975)). The trial court also must ensure that the defendant knows the maximum penalty for the charged crime. *See Howard*, 1 Wn. App. 2d at 429.

In addition, when determining whether the defendant's waiver is proper, the trial court must make every reasonable presumption against a waiver of the right to counsel. *Madsen*, 168 Wn.2d at 504. If the defendant's request is "made without a general understanding of the consequences," the trial court may deny that request for self-representation. *Id.* at 505.

On the other hand, a defendant's *ability* to represent himself is irrelevant in addressing a motion for self-representation. *See Madsen*, 168 Wn.2d at 505. The court in *Madsen* emphasized that, "[a] court may not deny a motion for self-representation based on grounds that self-representation would be detrimental to the defendant's ability to present his case." *Id.* For example, a trial court "may not deny pro se status merely because the defendant is unfamiliar with legal rules." *Id*. at 509. And the trial court may not consider the defendant's skill and judgment in assessing the right to self-representation. *Rhome*, 172 Wn.2d at 663. As long as the defendant's waiver of his constitutional right to counsel is voluntary, knowing, and intelligent, a defendant is free to exercise his or her constitutional right to self-representation even if exercising that right is not in his or her best interests. *See Madsen*, 168 Wn.2d at 504-05.

Further, the fact that a defendant's behavior impedes the orderly administration of justice is not a sufficient basis for denying a defendant's request to represent himself. *Id.* at 509. "Courts must not sacrifice constitutional rights on the altar of efficiency." *Id.* And the fact that the defendant is "obnoxious" also is not a proper basis for denying self-representation. *Id*.

Finally, the court in *Madsen* emphasized that the presumption against waiver of the right to counsel does not mean that the trial court can deny a request for self-representation without a proper basis. 168 Wn.2d at 504-05.

> The grounds that allow a court to deny a defendant the right to self-representation are limited to a finding that the defendant's request is equivocal, untimely, involuntary, or made without a general understanding of the consequences. Such a finding must be based on some identifiable fact.

*Id.*

We review for an abuse of discretion a trial court's decision to grant or deny a request for self-representation. *Curry*, 191 Wn.2d at 483. Abuse of discretion occurs where the trial court's decision is manifestly unreasonable, based on facts unsupported in the record, or based on an application of the wrong legal standard. *Id. at* 483-84. We give deference to the trial court's decision because trial courts have more experience than appellate courts in considering self-representation requests and "are better equipped to balance the competing considerations." *Id.* at 485. In addition, "trial courts have the benefit of observing the behavior and characteristics of the defendant, the inflections and language used to make the request, and the circumstances and context in which it was made." *Id.*

2. Thunder's Requests to Represent Himself

Thunder argues that the trial court erred in denying his three formal requests to represent himself. Because of Thunder's persistent refusal to meaningfully answer the court's questions each time a colloquy on the record was attempted, the trial court could not ascertain whether his waiver of the right to counsel was knowing and intelligent. Accordingly, we hold that the trial court properly denied each of Thunder's requests to represent himself.

a. October 2016 Request

Thunder argues that the trial court erred in denying his October 2016 request to represent himself on the ground that "it would be detrimental for him to do so." Thunder emphasizes that the court did not enter a finding that his request was equivocal, untimely, or not voluntary, knowing, or intelligent.

As Thunder correctly points out, the fact that self-representation would be detrimental to the defendant is not a proper basis for denying a self-representation request. *Madsen*, 168 Wn.2d at 505. "A court may not deny a motion for self-representation based on grounds that self-representation would be detrimental to the defendant's ability to present his case." *Id.* The trial court erred in suggesting otherwise. However, we can affirm on any grounds supported by the record. *State v. Jameison*, 4 Wn. App. 2d 184, 203, 421 P.3d 463 (2018). We hold that the trial court did not commit reversible error for two reasons.

First, Thunder's failure to cooperate with the trial court's attempted colloquy regarding his self-representation request prevented the court from determining whether the request was made with "a general understanding of the consequences." *Madsen*, 168 Wn.2d at 505. The court asked Thunder whether he had any legal training, what he knew about preparing a case for trial, what he knew about criminal procedure and the evidence rules, and what he had studied to determine his legal rights. Thunder refused to answer any of these questions, simply repeating after each one that he wanted to represent himself. When Thunder did answer a few questions, he demonstrated a lack of understanding regarding the case against him. When asked about the charges, he stated, "There is no charges." RP (Oct. 5, 2016) at 7. When asked about the State's burden of proof, he stated, "Burden of proof? What do you mean by burden of proof?" RP (Oct. 5, 2016) at 7.

If Thunder had answered that he had no legal knowledge or skills but wanted to represent himself anyway, the court may not have been able to deny the request on that basis. *Madsen,* 168 Wn.2d at 509; *see also Rhome*, 172 Wn.2d at 663. But Thunder's refusal to answer prevented the court from assessing whether his request was knowing and intelligent. And the

few questions he did answer showed that he did not understand the case against him. Therefore, we hold that the trial court had adequate grounds to deny Thunder's request to represent himself.

Second, the trial court did not make a final ruling on the self-representation issue at the October 2016 hearing. The court did initially state that it did not believe that it could allow Thunder to represent himself. But at the conclusion of the hearing, the court stated that it would "continue to attempt to inquire into [Thunder's] understanding and ability to articulate the requisite matters before granting him the right of self-representation in this circumstance." RP (Oct. 5, 2016) at 18-19. By doing so, the court both properly indulged the presumption against finding a waiver of counsel and allowed Thunder a future opportunity to show that his desire to represent himself was knowing, voluntary, and intelligent.

We hold that the trial court did not abuse its discretion in denying Thunder's October 2016 request to represent himself.

b. November 2016 Request

Thunder argues that the court erred in denying his November 2016 request to represent himself. He claims that the record shows that his request was knowing and intelligent.[2] We disagree.

During his colloquy with the court, Thunder refused to acknowledge that any charges were filed against him, the nature of the charges, or the seriousness of the charges. Further, Thunder failed to demonstrate an understanding of his maximum penalty if convicted, which the court was required to address. *See Howard*, 1 Wn. App. 2d at 429. When the court asked Thunder if he understood that if convicted he potentially could be sent to prison and incarcerated

---

[2] Thunder also argues that the trial court erred in ruling that his November 2016 request was untimely. However, the State does not rely on untimeliness to support the trial court's denial of the November 2016 self-representation request. Therefore, we do not address this argument.

for the rest of his life, Thunder simply repeatedly answered, "Slavery." RP (Nov. 7, 2016) at 7-8.

These exchanges support the trial court's finding that Thunder did not understand the consequences of waiving his right to counsel and that Thunder's waiver was not made intelligently. Thunder stubbornly refused to give the court enough information during the colloquy to determine whether his waiver of counsel was knowing and intelligent. Because of Thunder's failure to answer questions, the court could not determine whether he understood that he had been charged with four counts of second degree child rape or that he could face life in prison if convicted.

Accordingly, we hold that the trial court did not abuse its discretion in denying Thunder's November 2016 request to represent himself.

c. February 2017 Request

Thunder argues that the court erred in denying his February 2017 request to represent himself. He claims that he recognized the risks of self-representation and the seriousness of the charges, but wanted to represent himself anyway.[3] We disagree.

The trial court based its denial of Thunder's motion in part on a concern that Thunder did not have an adequate understanding of the law. A court may not deny self-representation "merely because the defendant is unfamiliar with legal rules." *Madsen* 168 Wn.2d at 509. In making a determination about whether the defendant has properly waived his right to counsel, the trial court may not consider the defendant's skill and judgment. *Rhome*, 172 Wn.2d at 663.

_____

[3] Thunder also argues that the trial court erred in ruling that his February 2017 request was untimely. Once again, the State does not rely on untimeliness to support the trial court's denial of the February 2017 self-representation request. Therefore, we do not address this argument.

Therefore, the trial court erred to the extent it based the denial of Thunder's self-representation request on Thunder's lack of legal knowledge.

However, the trial court based its decision on two other grounds. First, the court concluded that Thunder's waiver of the right to counsel was not knowing and intelligent. Although Thunder did answer some of the questions he refused to answer in earlier proceedings, he still failed to demonstrate an understanding of important concepts. When the court asked if he understood that he could be incarcerated for life if convicted, Thunder answered, "I comprehend that it is a fee that you guys are trying to charge me with and trying to use the jail time to pay the fee off when I have the right to pay the fee off and not do jail time." RP (Feb. 28, 2017) at 35. The court followed up by asking if Thunder understood what was at stake, he responded, "I comprehend a fee." RP (Feb. 28, 2017) at 35.

Thunder also failed to understand or accept the fact that the court planned to appoint standby counsel if Thunder represented himself. *See State v. McDonald*, 143 Wn.2d 506, 511, 22 P.3d 791 (2001) (noting that the trial court has authority to appoint standby counsel even over the defendant's objection). When the court asked if appointing Thunder's current defense counsel as standby counsel would be a problem, Thunder answered, "Like I said, I'm using myself as a special appearance underneath Rule E8 [*sic*] without granting jurisdiction. I don't grant you guys jurisdiction." RP (Feb. 28, 2017) at 42.

Second, the trial court based its ruling on a concern about Thunder's conduct in court and his refusal to confirm that his conduct would not be an issue. A defendant's disruptive behavior in the courtroom can preclude the defendant from representing himself. *State v. Hemenway*, 122 Wn. App. 787, 792, 95 P.3d 408 (2004). A defendant cannot seek self-representation in order to cause delay or obstruct the administration of justice, and a defendant can waive self-

15

representation by disruptive words or misconduct. *Id.*; *see also State v. Thompson*, 169 Wn. App. 436, 468-69, 290 P.3d 996 (2012) (holding that the defendant's purposefully disruptive conduct supported the trial court's denial of a self-representation request).

Thunder's behavior during the entire case – before, during, and after trial – was extremely volatile, disruptive, and obstructionist. Thunder's outbursts and other disruptive conduct was so severe that the court authorized correction officers to use a stun belt on him in order to maintain order and decorum during trial.

The trial court attempted to obtain assurances from Thunder that he would conduct himself appropriately, but Thunder refused to answer the court's questions. Instead, he responded with rambling answers that had nothing to do with his conduct.

Had Thunder represented himself at trial, he likely would have used the opportunity to delay and frustrate the proceedings in the same manner he had delayed and frustrated his arraignment, the collection of DNA evidence, and all three of his colloquies with the court on the issue of self-representation. Thunder gave the court no indication that his behavior would improve if allowed to represent himself.

As the Supreme Court emphasized in *Curry*, we must give deference to trial courts in addressing self-representation requests in part because "trial courts have the benefit of observing the behavior and characteristics of the defendant." 191 Wn.2d at 485. The trial court here was in the best position to determine whether Thunder's waiver of his right to counsel was knowing and intelligent, and we defer to the trial court's conclusion that the waiver was not. Accordingly, we hold that the trial court did not abuse its discretion by denying Thunder's February 2016 request to represent himself.

B.    TIME FOR TRIAL/SPEEDY TRIAL RIGHT

Thunder argues the 12-month delay between his arraignment and trial violated both CrR 3.3, the time for trial rule, and his constitutional right to a speedy trial.  We disagree.

1.    Time for Trial Under CrR 3.3

a.    Legal Principles

CrR 3.3 governs a defendant's right to be brought to trial in a timely manner.  CrR 3.3(b)(1) and (c)(1) provide that a defendant who is detained in jail must be brought to trial within 60 days of arraignment.  The purpose of this rule is to protect a defendant's constitutional right to a speedy trial.  A charge not brought to trial within the time limits of CrR 3.3 generally must be dismissed with prejudice.  CrR 3.3(h).

CrR 3.3(e) provides that certain time periods are excluded in computing the time for trial.  These excludable time periods include continuances the court grants under CrR 3.3(f), CrR 3.3(e)(3) and "[u]navoidable or unforeseen circumstances affecting the time for trial beyond the control of the court or of the parties."  CrR 3.3(e)(8).  Under CrR 3.3(f), the trial court may continue the trial date on motion of the court or a party "when such continuance is required in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense."  CrR 3.3(f)(2).  In granting a motion for a continuance, "[t]he court must state on the record or in writing the reasons for the continuance."  CrR 3.3(f)(2).  When any period is excluded under CrR 3.3(e), the time for trial period extends to at least 30 days after the excluded period ends.  CrR 3.3(b)(5).

We review an alleged violation of the time for trial rule de novo.  *State v. Kenyon*, 167 Wn.2d 130, 135, 216 P.3d 1024 (2009).  However, we review the trial court's decision to grant a continuance for an abuse of discretion.  *See id*.  In addition, once a continuance is properly

granted the trial court has discretion in selecting the new trial date. *See State v. Flinn*, 154 Wn.2d 193, 200-01, 110 P.3d 748 (2005). A court abuses its discretion if its decision is manifestly unreasonable, based on untenable grounds, or based on untenable reasons. *Kenyon*, 167 Wn.2d at 135.

> b. Thunder's Objections to Continuances

Thunder argues that the court abused its discretion by granting continuances over his objections, even though his attorney on his behalf brought or joined many of the continuance motions. We disagree.

Moving for a continuance "by or on behalf of any party waives that party's objection to the requested delay." CrR 3.3(f)(2). Under the time for trial rule, defense counsel has authority to make binding decisions to seek continuances. *State v. Ollivier*, 178 Wn.2d 813, 825, 312 P.3d 1 (2013).

A trial court does not necessarily abuse its discretion by granting defense counsel's request for more time to prepare for trial to ensure effective representation and a fair trial, even over defendant's objection. *State v. Saunders*, 153 Wn. App. 209, 217 n.8, 220 P.3d 1238 (2009). This rule applies where defense counsel's requests are adequately supported by reasons designed to avoid prejudice to defendant, even in the case of multiple requests for such continuances. *See Ollivier*, 178 Wn.2d at 824-25.

Thunder analogizes his case to *Saunders*, where the appellate court dismissed a conviction based on CrR 3.3 after the trial court granted multiple continuances requested by both the State and defense counsel despite the defendant's objections. 53 Wn. App. at 220-21. However, in *Saunders* the continuances at issue were granted to facilitate ongoing plea negotiations contrary to the defendant's desire to go to trial. *Id.* And the appellate court

ultimately reversed not because the defendant objected to the continuances, but because the trial court did not give an adequate explanation for granting them. *Id.* at 221.

Here, the continuances were not granted to permit plea negotiations. Instead, every continuance was to allow for either substitution of counsel, ensuring Thunder's competency to stand trial, ongoing developments in the trial evidence, or short periods of court congestion. Each continuance was granted with the goal of ensuring Thunder's right to a fair trial. And the trial court gave explanations for each continuance, either on the record or in a scheduling order. Although Thunder made repeated objections, his attorney was authorized to request the continuances in order to avoid prejudice to him.[4]

c. Reasonableness of the Continuances

Thunder argues that the trial court abused its discretion by granting continuances that were manifestly unreasonable. He argues that although both the State and defense counsel claimed they needed more time to prepare for trial, none of the continuances had a valid basis. We find that each continuance was reasonable.

First, the trial court granted continuances in April and June 2016 to allow both parties additional time to prepare for trial. In both instances, a new attorney had recently appeared in the case: new defense counsel in April and a new prosecutor in July.

Second, the trial court granted a continuance in August because defense counsel had a preplanned vacation and because the State was still waiting for DNA analysis results from WSP. Under CrR 3.3(f), the trial court can consider scheduling conflicts in granting continuances.

---

[4] Thunder also argues that defense counsel's motions for continuance were inconsistent with his ethical obligations under RPC 1.2(a), which requires counsel to "abide by a client's decisions concerning the objectives of representation." But Thunder has not asserted an ineffective assistance of counsel claim. Therefore, we need not address this argument.

*Flinn*, 154 Wn.2d at 200. And granting a short continuance to accommodate defense counsel's vacation plans is not abuse of discretion, in the absence of any showing that defendant was prejudiced by delay. *State v. Selam*, 97 Wn. App. 140, 143, 982 P.2d 679 (1999). Here, trial was only continued six days, during which time nothing occurred to prejudice Thunder's case. In fact, the State was still awaiting test results and likely would have secured a continuance on its own even without the conflict with defense counsel's vacation.

Third, the trial court granted a continuance in September to allow time for WSP to complete the DNA analysis. A continuance necessary for the State to obtain DNA evidence does not deprive a defendant charged with rape of his statutory right to speedy trial where no harm was done to defendant's case in the interim. *See State v. Cauthron*, 120 Wn.2d 879, 910, 846 P.2d 502 (1993). Here, nothing occurred during the additional time the State requested to wait for the DNA results that harmed Thunder's case. In fact, during this time, defense counsel prepared and filed a motion to dismiss for speedy trial violations and late disclosure of DNA evidence.

Fourth, the trial court granted a two-day continuance on November 7 to allow the State time to respond to Thunder's motion to dismiss based on speedy trial violations. When the parties returned to court on November 9, the court denied this motion and granted defense counsel a continuance to secure a DNA expert to review the State's evidence. Thunder himself seems to have condoned this request, because the record reflects that he verbally authorized his attorney to find an expert.

Fifth, in December, the trial court granted the State a continuance in order to comply with the defense's request for supplemental discovery regarding the DNA analysis from WSP. Allowing for discovery is a reasonable basis for a continuance. *See Ollivier*, 178 Wn.2d at 825.

Given the trial court's broad discretion in addressing continuances and the absence of any prejudice, we hold that the trial court did not abuse its discretion in granting the continuances in Thunder's case. The proper continuances extend the time for trial deadlines, meaning that no time for trial violations occurred. Accordingly, we hold that the trial court did not violate the time for trial requirements under CrR 3.3.

### 2. Constitutional Right to Speedy Trial

#### a. Legal Principles

Both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a criminal defendant the right to a speedy trial. *State v. Iniguez*, 167 Wn.2d 273, 281-82, 217 P.3d 768 (2009). The analysis for speedy trial rights under article I, section 22 is substantially the same as the analysis under the Sixth Amendment. *Ollivier*, 178 Wn.2d at 826. We review questions of constitutional speedy trial rights de novo. *Iniguez*, 167 Wn.2d at 280-81.

We use the balancing test set out in *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972) to determine whether the defendant's constitutional right to speedy trial was violated. *Ollivier*, 178 Wn.2d at 827. Among the nonexclusive factors to be considered are the " '[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.' " *Id.* (quoting *Barker*, 407 U.S. at 530). None of these factors alone is sufficient or necessary to find a violation, but they assist in determining whether the right to a speedy trial has been violated. *Ollivier*, 178 Wn.2d at 827.

In order to trigger the analysis under *Barker*, the defendant must make a threshold showing that the time between the filing of charges and trial exceeded the ordinary interval for prosecution and crossed into presumptively prejudicial delay. *Id.* (citing *Doggett v. United*

*States*, 505 U.S. 647, 651-52, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992)).  The longer the delay and the less complex the case, the more likely the court will find presumptive prejudice.  *See Ollivier*, 178 Wn.2d at 828.  If this threshold showing is met, the court then considers " 'the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim.' " *Id.* at 828 (quoting *Doggett*, 505 U.S. at 652).  In addition, courts generally have found presumptively prejudicial delay at the point where the delay approaches one year.  *Ollivier*, 178 Wn.2d at 828.

Here, there was a period of 357 days between Thunder's arraignment and the start of his trial.  The charges against Thunder, four counts of second degree child rape, were relatively straightforward.  Because the length of the delay is at odds with the complexity of the case, the delay is presumptively prejudicial and triggers the *Barker* analysis.

b.    Length of Delay

The first *Barker* factor is length of delay.  *Ollivier*, 178 Wn.2d at 827-28.  Thunder argues that the 12-month delay in his case weighs in his favor because his case was not complex and because he objected to the continuances requested by both attorneys.

But we disagree that this was a case where the delay was highly disproportionate to the complexity of the issues and both parties' need for preparation.  Early on, Thunder's volatile and uncooperative behavior necessitated a competency hearing to ensure he was able to stand trial.  The State did not learn until July 2016 that DNA evidence from the rape kit was available to compare to Thunder's DNA.  The trial court concluded that the three months it took to test the DNA was not unduly lengthy.  Defense counsel then requested additional time to secure an expert and subsequently filed a supplemental discovery request on the DNA evidence for which

the State required additional time to respond, delaying the trial from November 2016 to February 2017.

In *Ollivier*, the Supreme Court concluded that a 23-month delay weighed against the defendant when the delay was sought by defense counsel and was reasonably necessary for defense preparation. 178 Wn.2d at 828-31. Similarly, nearly all of the continuances here were sought in order to ensure that defense counsel was fully prepared and to ensure that Thunder received a fair trial after new issues came to light. We conclude that the length of delay was reasonably necessary for defense counsel's trial preparation and therefore weighs against Thunder.

c. Reason for Delay

The second *Barker* factor is the reason for the delay. *Ollivier*, 178 Wn.2d at 827, 831. Thunder argues that this factor in the *Barker* analysis weighs in his favor because he objected to each continuance requested by his attorney and was ready to represent himself at all times. However, even where continuances are sought over the defendant's objection, delay caused by the defendant's counsel can be charged against the defendant under the *Barker* balancing test if the continuances were sought in order to provide professional assistance in the defendant's interests. *Ollivier*, 178 Wn.2d at 834.

A number of reasons factored into the delays in Thunder's case: new attorneys appearing in the case on both sides, a competency hearing to ensure Thunder could stand trial, the wait for DNA test results, occasional court congestion, the defense's request for more time to find a DNA expert, and the State's request for additional time to provide the defense with supplemental discovery. Of the seven continuances granted in this case, defense counsel brought or joined five of them for the sake of being better prepared for trial. The two continuances defense counsel did

not join were both for purposes of allowing the State to respond to filings by the defense made shortly before trial was scheduled.

Thunder also argues that the government negligently mismanaged DNA evidence, disclosing the results of DNA testing so close to trial that he was forced to choose between a waiver of his speedy trial right and his right to effective assistance of counsel. However, Thunder's defense counsel made this same argument in his November 2016 motion to dismiss, which the trial court denied. The court found that the delay in completing DNA test results was not attributable to the State's negligent handling and that the results were acquired within a normal time frame. Thunder does not challenge this finding on appeal, and unchallenged findings of fact supported by substantial evidence are verities on appeal. *State v. Chambers*, 197 Wn. App. 96, 124, 387 P.3d 1108 (2016), *review denied*, 188 Wn.2d 1010 (2017).

Given the fact that most of the continuances in this case were granted to accommodate the trial preparation of both parties, we conclude that the reason for delay factor should weigh against Thunder.

### d.    Assertion of Right

The third *Barker* factor is the defendant's assertion of his speedy trial right. *Ollivier*, 178 Wn.2d at 827, 837. Thunder argues that because he requested to represent himself and objected to each continuance, this factor of the *Barker* analysis should weigh in his favor.

However, as stated above, continuances sought by defense counsel in the defendant's best interest can be charged against the defendant in a *Barker* analysis even if the defendant himself objected to the continuances. *Ollivier*, 178 Wn.2d at 834, 838. Nothing in the record suggests that defense counsel requested the continuances for any other reason than to be more adequately prepared to present Thunder's defense at trial. In *Ollivier*, the fact that defense counsel

requested many of the continuances and furthered the defendant's right to counsel meant that this factor did not weigh in favor of the defendant. *Id.* at 838-40.

We conclude that the assertion of rights factor does not weigh in Thunder's favor.

e.    Prejudice

The fourth *Barker* factor is whether the delay has prejudiced the defendant. *Ollivier*, 178 Wn.2d at 827, 840. Thunder argues that this factor weighs in his favor because the delays in his case subjected him to heightened anxiety and concern while enduring lengthier pre-trial incarceration caused by continuances requested by his unwanted counsel.

Prejudice to the defendant as a result of delay may consist of (1) oppressive pretrial incarceration, (2) the defendant's anxiety and concern, and (3) the possibility that dimming memories and loss of exculpatory evidence will impair the defense. *Ollivier*, 178 Wn.2d at 840. Prejudice is not always presumed. *Id.* A defendant ordinarily must establish actual rather than theoretical prejudice. *Id.* " 'When the government prosecutes a case with reasonable diligence, a defendant who cannot demonstrate how his defense was prejudiced with specificity will not make out a speedy trial claim.' " *Id.* at 841 (quoting *United States v. Howard*, 218 F.3d 556, 564-65 (6th Cir. 2000)).

Here, Thunder has not pointed to any specific way in which his defense was prejudiced as a result of any of the continuances granted in his case beyond a generalized claim that he was exposed to heightened anxiety about his case. We conclude that this argument is not sufficient to show prejudice to Thunder and that this factor weighs against him.

f.    Balancing the Factors

We must balance the individual Barker factors. *Ollivier*, 178 Wn. 2d at 846. Taking all the *Barker* factors together, we find that the balancing test weighs against Thunder.

Accordingly, we hold that Thunder's speedy trial rights under the United States and Washington Constitutions were not violated.

C.      COMMUNITY CUSTODY CONDITIONS

Thunder argues, and the State concedes, that the trial court acted without authority in imposing community custody conditions prohibiting the use of alcohol, requiring an alcohol and chemical dependency evaluation, and prohibiting access to the Internet because they were not crime-related.  We agree.  Thunder also argues that community custody conditions prohibiting Thunder from entering sex-related businesses and possessing or viewing sexually explicit material were not crime-related.  We disagree.

1.      Standard of Review

We review de novo the sentencing court's statutory authority to impose a particular community custody condition.  *State v. Acevedo*, 159 Wn. App. 221, 231, 248 P.3d 526 (2010).  However, we review a challenge that the condition is not crime-related for abuse of discretion.  *State v. Nguyen*, 191 Wn.2d 671, 683-84, 425 P.3d 847 (2018).

If we determine a sentencing court imposed an unauthorized condition on community custody, we remedy the error by remanding to the sentencing court with instruction to strike the unauthorized condition.  *State v. O'Cain*, 144 Wn. App. 772, 775, 184 P.3d 1262 (2008).

2.      Crime-Related Community Custody Conditions

Thunder argues that the trial court imposed several community custody conditions that were not crime related.  RCW 9.94A.703(3)(f) provides the sentencing court discretionary authority to order Thunder to "[c]omply with any crime-related prohibitions."  A " 'crime-related

26

prohibition' means an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10).

"A court does not abuse its discretion if a 'reasonable relationship' between the crime of conviction and the community custody condition exists. . . . The prohibited conduct need not be identical to the crime of conviction, but there must be 'some basis for the connection.' " *Id.* at 684 (quoting *State v. Irwin*, 191 Wn. App. 644, 657, 364 P.3d 830 (2015)).

### a.    Use of Alcohol

Condition 11 states, "Do not use or consume alcohol." CP at 243. Where the underlying crime is not alcohol related, an instruction not to "consume" alcohol is proper, but an instruction not to "use" alcohol is not. *State v. Norris*, 1 Wn. App. 2d 87, 100, 404 P.3d 83 (2017), *aff'd in part, rev'd in part sub nom. State v. Nguyen*, 191 Wn.2d 671, 425 P.3d 848 (2018). Here, there is no evidence that alcohol played a role in Thunder's offense. The State concedes that the sentencing court did not have authority to order Thunder to refrain from the "use" of alcohol. Therefore, the trial court erred by prohibiting the "use" of alcohol in condition 11.

### b.    Alcohol and Chemical Dependency Evaluation

Condition 22 requires Thunder to obtain an alcohol and chemical dependency evaluation and to follow through with all recommendations of the evaluator. Conditions imposed as "rehabilitative programs" such as alcohol and chemical dependency interventions "must be supported by evidence in the record or found by the trial court to be related to the underlying offense." *State v. Munoz-Rivera*, 190 Wn. App. 870, 892, 361 P.3d 182 (2015). The State concedes that nothing in the record supports the contention that drugs or alcohol contributed to Thunder's crimes. Therefore, the trial court erred in imposing condition 22.

c. Use of Internet

Condition 23 states, "No [I]nternet access or use, including email, without the prior approval of the supervising [community corrections officer]." Condition 24 prohibits "use of a computer, phone, or computer-related device with access to the Internet." CP at 244.

Internet use is crime related if there is evidence that Internet use "contributed in any way to the crime." *O'Cain*, 144 Wn. App. at 775. Here, there was no evidence that the Internet use contributed in any way to Thunder's offense. The State concedes that conditions 23 and 24 are not crime related. Therefore, the trial court erred in imposing conditions 23 and 24.

d. Sex-Related Businesses and Sexually Explicit Material

Community custody conditions 9 and 10 are special conditions that apply to sex offenses. They provide as follows:

9. Do not enter sex-related businesses, including: x-rated movies, adult bookstores, strip clubs, and any location where the primary source of business is related to sexually explicit material. – Absent approval of treatment provider[.]

10. Do not possess, use, access or view any sexually explicit material as defined by RCW 9.68.130 or erotic materials as defined by RCW 9.68.050 or any material depicting any person engaged in sexually explicit conduct as defined by RCW 9.68A.011(4) unless given prior approval by your sexual deviancy provider.

CP at 243.

Thunder argues that these conditions both must be stricken because they are not crime related and RCW 9.94A.703 does not explicitly authorize them. However, the Supreme Court in *Nguyen* held that a trial court did not abuse its discretion in imposing a condition prohibiting the defendant from entering sex-related businesses when the crime of conviction was child molestation. The court noted that there was no evidence the defendant in that case met her victim in a sex-related business or that her presence in such a business played a role in her crimes. *Nguyen*, 191 Wn.2d at 687. But the court stated that "this condition has more to do with

[the defendant's] inability to control her urges and impulsivities than it does with the specific facts of her crimes." *Id.*

Similarly, the court in *Nguyen* held that a trial court did not abuse its discretion in imposing a condition prohibiting the defendant from possessing or viewing sexually explicit material when the crime of conviction was child rape and child molestation. *Id.* at 686. The court stated that access to sexually explicit material was reasonably related to the defendant's crimes. *Id.* at 684. The court stated, "It is both logical and reasonable to conclude that a convicted person who cannot suppress sexual urges should be prohibited from accessing 'sexually explicit materials,' the only purpose of which is to invoke sexual stimulation." *Id.* at 686.

Based on the court's analysis in *Nguyen*, we hold that the trial court did not abuse its discretion in imposing community custody conditions 9 and 10.

D.      IMPOSITION OF LFOS

Thunder argues in a supplemental brief that under recently enacted legislation, we should strike the criminal filing fee and DNA collection fee the trial court imposed on him. The State concedes that the criminal filing fee should be stricken but argues that Thunder has made no showing that a prior DNA collection occurred. We agree that the criminal filing fee should be stricken, but we affirm the imposition of the DNA collection fee.

The trial court imposed as mandatory LFOs a $200 criminal filing fee and a $100 DNA collection fee. In 2018, the legislature amended (1) RCW 36.18.020(2)(h), which now prohibits imposition of the criminal filing fee on an indigent defendant; and (2) RCW 43.43.7541, which established that the DNA collection fee no longer is mandatory if the offender's DNA previously had been collected because of a prior conviction. The Supreme Court in *State v. Ramirez* held

that these amendments apply prospectively to cases pending on direct appeal. 191 Wn.2d 732, 749-50, 426 P.3d 714 (2018).

Here, the trial court found that Thunder was indigent at the time of sentencing. Therefore, under the current version of RCW 36.18.020(2)(h) the criminal filing fee imposed upon Thunder must be stricken.

Thunder argues that the DNA fee must also be stricken because his DNA was collected before trial in this case. But this collection of Thunder's DNA does not affect the DNA collection fee imposed here because the amended RCW 43.43.7541 applies only if the offender's DNA has been collected as a result of a *prior conviction*.

Thunder also argues that his previous convictions would have resulted in the State's collection of his DNA in connection with those convictions. Thunder was convicted of a misdemeanor in 2008 and again in 2010. Under RCW 43.43.7541, the 2010 misdemeanor harassment conviction should have resulted in the State's collection of Thunder's DNA and the imposition of the $100 collection fee. However, despite a search of WSP records, the State was unable to find evidence of a prior felony conviction or that Thunder's DNA was previously collected, and Thunder presents no evidence that the DNA fee previously was imposed on him.

Therefore, Thunder has not shown that under the current version of RCW 43.43.7541 the trial court erred in imposing the DNA collection fee.

E.      SAG CLAIMS

In his SAG, Thunder identifies two claims: "Allocution Statement of Fraud" and "Notice of Forgery." SAG at 1. Also included is a "Certificate of Exemption on Indigenous Grounds Denial of Corporate Status and Negative Areument [*sic*] /Affidavit." SAG at 1. And the SAG contains a heading stating, "Notice to the Agent is Notice to the Principle [*sic*] and Notice to the

Principle [*sic*] is Notice to the Agent." SAG at 9. The SAG contains many of the same opinions, assertions, and nontraditional legal theories that Thunder expressed in the form of outbursts during proceedings on the record.

RAP 10.10(c) states that an "appellate court will not consider a defendant's statement of additional grounds for review if it does not inform the court of the nature and occurrence of alleged errors." Thunder's claims essentially are unintelligible, and the SAG does not meaningfully explain how the trial court erred. In addition, RAP 10.10(c) states that "the appellate court is not obligated to search the record in support of" the defendant's SAG claims. Thunder's SAG does not contain any specific references to the record.

Accordingly, we decline to consider Thunder's SAG claims.

CONCLUSION

We affirm Thunder's convictions, but we remand to the trial court to strike a portion of community custody condition 11 and community custody conditions 22, 23, and 24 and to strike the criminal filing fee.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, C.J.

We concur:

_____
WORSWICK, J.

_____
MELNICK, J.